SOUTH PORTLAND
ASSOCIATES et al.

v.

CITY OF SOUTH PORTLAND.

Supreme Judicial Court of Maine.

Argued Sept. 15, 1988.
Decided Nov. 10, 1988.

F. Paul Frinsko, Bernstein, Shur, Sawyer & Nelson, Portland, Edward G. Rosenblum (orally), Rosenblum & Rosenblum, Secaucus, N.J., for plaintiffs.

Steven C. Fletcher (orally), South Portland, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and HORNBY, JJ.

McKUSICK, Chief Justice.

In this action brought under M.R.Civ.P. 80B, South Portland Associates and Wilson R. Kaplen, the owners of two large residential rental complexes in South Portland, seek review of the denial by the South Portland Board of Assessment Review of their requests for property tax abatements for the tax years 1985–86 and 1986–87. The Superior Court (Cumberland County; *Alexander, J.*) 1) affirmed the Board's denial as to the year 1985–86; and 2) dismissed the taxpayers' Rule 80B action as to the year 1986–87 on the ground the Board never had before it a valid request for abatement on the second year's taxes. We disagree with the Superior Court on its dismissal of the case as to the second year, and so proceed to review directly the Board's action in denying abatements for both years. We conclude that the Board erred in upholding the refusal by the Assessor of the City of South Portland even to consider the income method of valuing the taxpayers' particular rental properties. We remand the case to the Board of Assessment Review for it to reconsider the taxpayers' abatement requests for both years, giving consideration to an income analysis as well as all other evidence relevant to determining the fair market value of the taxpayers' apartment complexes.

## I.

The threshold question on appeal is which years' assessments are properly at issue before us. The Board of Assessment Review denied abatements for two tax years. Before us, the taxpayers argue that the Superior Court should have ruled on the merits of both years' abatement appeals, while the City argues that the Superior Court should have dismissed the first year's appeal as well as the second, on the ground that the taxpayers' original abatement request was time-barred. We agree with the taxpayers that the Board acted within its authority in ruling on the abatement requests for both years.

The City conducted a comprehensive revaluation in the spring of 1985 to serve as the basis for real estate tax assessments in 1985–86 and subsequent tax years. The revaluation put an assessed valuation on the taxpayers' properties much at odds with the taxpayers' own appraisals of their properties. After unsuccessful negotiations with the City's Assessor, the taxpayers filed abatement applications in the Assessor's office on September 16, 1986, two weeks before the statutory deadline for final action by the Assessor on 1985–86 abatement requests. *See* 36 M.R.S.A. § 841(1) (Supp.1988). Although all the negotiations had concerned 1985–86 taxes and the date of commitment for 1986–87 taxes had not yet arrived, the figures "1986/87" were typed on the forms in the blank asking for the "tax year for which abatement is requested." In all the proceedings that followed, both the Assessor and the Board accepted the taxpayers' explanation that they had made a simple typographical error in filling in the blank and all concerned acted as if 1985–86 was the tax year in issue. The Superior Court so found.

The City has not demonstrated, or even expressly tried to demonstrate, that this factual determination by the Superior Court was clearly erroneous. Instead, the City argues that the deadline for correcting the date had passed by the time the taxpayers realized that they had filed, and the Assessor and the Board had acted on, defective applications. From that, the City now contends that the entire proceeding before the Board, resting as it did on those defective applications, was invalid and beyond the authority of the Board to entertain. We find no merit in this belated contention. In the administrative proceedings both the Board and the adversary parties operated on the understanding that the applications filed on September 16, 1986, pertained to the 1985–86 tax year. The typographical error has caused prejudice to no one. It would be a reversion to the technicalities of Baron Parke, unworthy of modern, simplified administrative procedure, if we were to disregard the shared understanding of all concerned. Even in court proceedings, the City's argument would be given short shrift. *Cf.* M.R. Civ.P. 15(b) (amendment to conform to the

evidence); *Sawyer v. White,* 125 Me. 206, 210, 132 A. 421, 422–23 (1926) (shortcoming in a pleading will be disregarded if the parties proceed as if the shortcoming had been corrected by amendment). The only authority the City cites for its position is a pair of cases in which we rejected the negligence of the appellants' counsel as justification for the extension of filing time for an appeal from a final court judgment. *Eaton v. LaFlamme,* 501 A.2d 428 (Me. 1985); *Begin v. Jerry's Sunoco, Inc.,* 435 A.2d 1079 (Me.1981). In both of the cited cases, however, the problem was not a failure to correct an error in a defective notice before the filing deadline, but rather a failure to file any document at all. By contrast, we recently found excusable neglect to exist when a timely appeal that lay only to the Law Court was mistakenly directed to the Superior Court. *See In re Amanda D.,* 549 A.2d 1133, 1134 (Me.1988).

■ The Superior Court correctly ruled that the taxpayers' abatement applications and the subsequent review proceedings before the Board were validly directed toward the 1985–86 assessments. It does not follow, however, that the Board's further action upon abatement requests for 1986–87 was invalid. After two long evenings of hearings on the first year's taxes, and denial of abatements for that year, the Board on March 19, 1987, voted unanimously to deny the second year's abatements as well, on the basis of the evidence already presented. The Assessor, who was present when this vote was taken, had testified at length in support of his valuations as the basis for both years' assessments. The hearings were held, and the Board's decision reached, well within the period when 1986–87 abatement applications and appeals were both proper.[1] No one whatever at that meeting, least of all any representative of the City, objected to the Board's treatment of the Assessor's testimony as a denial of both years' abatement requests or to the Board's consideration and denial of

the second year's appeal along with the first year's. The Board's chosen procedures are entitled to the deference of the reviewing courts. *See Town of Wiscasset v. Board of Envtl. Protection,* 471 A.2d 1045, 1048 (Me.1984). We therefore vacate the Superior Court's dismissal of the taxpayers' Rule 80B complaint relative to their abatement request for the second year.

## II.

### A.

■ We turn now to the assessments themselves. The subject properties are two large residential apartment complexes built by the federal government in 1942 to house workers engaged in the war effort at the South Portland shipyard and elsewhere. It was emergency housing, "not built with longevity in mind." The larger, Redbank Village (also known as South Portland Gardens), is situated between the Portland Jetport and the Maine Mall shopping area and consists of 238 residential structures (containing a total of 501 one-, two-, and three-bedroom apartments) and an administration building. The other, Millcove Gardens (sometimes referred to as Millco Gardens), situated near Mill Cove at the other end of South Portland, consists of 24 buildings with a total of 94 one-bedroom apartments. Redbank is owned by a New Jersey partnership, South Portland Associates, of which Wilson R. Kaplen is a partner. Kaplen owns Millcove individually. The taxpayers bought the rental complexes at auction from the federal government in 1951 and have ever since operated them as large unitary rental projects.

In making its 1985 revaluation of all taxable real estate in South Portland, the City contracted with a professional tax appraisal firm, Municipal Management Company, to assist its fulltime Assessor. Pursuant to the contractual authority reserved to him to supervise the work of the apprais-

---

1. South Portland taxes for 1986–87 were committed on October 1, 1986. On written application or his own initiative, the Assessor could make an abatement of those taxes within one year after commitment, 36 M.R.S.A. § 841(1) (Supp.1988), and the taxpayers could appeal a denial of an abatement to the Board of Assessment Review within 60 days after notice of the denial of an abatement request. *Id.* § 843(1).

al firm, the Assessor gave it specific directions not to use the income approach on any of the South Portland properties to be appraised. This directive was consistent with the Assessor's fixed policy, declared before, during, and after the revaluation, to reject the income approach in appraising any and all properties of whatever nature in South Portland. Although no one from Municipal Management Company testified on the record now before the court, every indication in its report and in the other evidence is that it faithfully complied with the Assessor's directive and gave no consideration to the income approach. Rather it used solely a replacement cost less depreciation method. The Assessor, adopting without change the figures produced by the professional appraisal firm, assessed the Redbank apartment complex at about $11,500,000 [2] and the Millcove apartment complex at over $1,700,000.

The taxpayers requested abatements on both Redbank and Millcove, and when the Assessor denied those requests they appealed to the South Portland Board of Assessment Review. 36 M.R.S.A. § 843(1) (Supp.1988). In the course of extensive hearings before the Board, witnesses for the taxpayers testified to the special circumstances of Redbank and Millcove that made a cost or market appraisal method relatively unreliable and made an income approach relatively more reliable. The principal professional appraisal witness who testified for the taxpayers, predicating his opinion "primarily ... upon capitalization of stabilized annual net operating income," fixed the fair market value of the Redbank apartment complex at $6,900,000 and that of Millcove at $1,135,000. The Board on March 19, 1987, denied the re-

quested abatements for both tax years 1985–86 and 1986–87. The taxpayers appealed to the Superior Court, and on the record made before the Board, the Superior Court affirmed the Board's denial of any abatement on the 1985–86 taxes.[3]

On appeal we review the Board's decision directly for error of law. *See Ray v. Town of Camden*, 533 A.2d 912, 914 (Me.1987). On making such review we conclude that the Board on the record made before it [4] was compelled to find that the Assessor's categorical refusal to consider an income analysis in valuing Redbank and Millcove was arbitrary and unreasonable.[5] Since the Board itself did not make any independent determination of the fair market value on the basis of an income analysis and all other relevant evidence, it had no basis for its ultimate finding that "the assessed value of this property is not so unreasonable as to result in an injustice." In order for the Board to perform its statutory responsibility of "grant[ing] such reasonable abatement as [it] thinks proper," 36 M.R.S.A. § 843(1), we remand the case to the Board to make that independent determination.

### B.

As we said in *Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 390 (Me. 1981):

[T]his Court has permitted the local assessors considerable leeway in choosing the method or combinations of methods to achieve just valuations. We have found acceptable as techniques to aid local assessors at least three standard appraisal methods of determining the

2. The above assessment figure for the Redbank apartment complex does not include the assessed value of adjacent unimproved land owned by South Portland Associates that is not at issue here.

3. The Superior Court dismissed the taxpayers' claim as to 1986–87 taxes. See Part I above.

4. The hearings before the Board of Assessment Review focused almost exclusively on Redbank, the larger of the two projects. Indeed, the manner in which the hearings were conducted was tantamount to a stipulation that the Millcove

assessment is valid if, but only if, the Redbank assessment is valid.

5. Our conclusion relative to the tax assessments on Redbank and Millcove is based upon the evidentiary record made before the Board as to these particular properties. We must not be understood as expressing any opinion whether the Assessor's categorical rejection of an income approach is arbitrary and unreasonable as applied to other properties in the City of South Portland.

market value of real property: (1) the "comparative" or "market data" approach, (2) the "income" or "capitalization" approach, and (3) the "reproduction cost less depreciation" or "cost" approach.

In *Shawmut Inn* we recognized that the "cost" approach was the method recommended by the State Bureau of Taxation as "the method best suited to the requirements of a mass revaluation program." *Id.* at 390 n. 4. But we specifically rejected the "proposition that the use of the single 'cost' approach in valuing income-producing property will always be acceptable." *Id.* at 391. Instead, we declared "that where professional appraisers choose the 'cost' approach as a starting point for a general revaluation, they should use other methods as checks in testing the reasonableness of such values as may appear questionable. The process of 'correlation' can be particularly useful in valuing a commercial property...." *Id.* at 392.

In *Shawmut Inn* we described correlation as follows: "To correlate, an appraiser must calculate value by two or more appraisal methods and then weigh the factors used in arriving at each value to determine which method best reflects the market value." *Id.* at 391; *see also id.* at 391–92 n. 6. By that description of the required correlation, we did not mean that the appraiser could merely select any two appraisal methods and disregard a third method demonstrably superior in reliability to both. Which, if any, valuation methods are appropriate to use for correlation depend on the facts of the particular case. To whatever extent the South Portland Assessor checked his cost-based valuations of Redbank and Millcove by a market analysis, he still did not conform to *Shawmut Inn* if the rejected income approach is markedly more reliable in the circumstances than are the cost and market valuation approaches. Both the cost and the market approaches suffer serious methodological deficiencies when they are used in an attempt to appraise the taxpayers' particular properties in South Portland.

The replacement cost method uses as its benchmark the amount it would cost, if the land were still unimproved, to buy the land and build a functionally equivalent structure upon it. An assessor using that method must then make one, and possibly two, downward adjustments: He must estimate the "depreciation," the difference in value between the hypothetical new building and the actual old building; and if constructing the hypothetical replacement would not be economically viable, he must make a further reduction for economic obsolescence.

Redbank presents far more than the usual amount of uncertainty at several steps in applying a replacement cost less depreciation method. To begin with, the underlying land values are hard to gauge. Redbank is a residentially zoned island in the commercial and industrial area between the Portland Jetport and the Maine Mall. The project is serenaded by air traffic and has at times been flooded by runoff from an abutting dumpsite. The City does not dispute the taxpayers' evidence that no prudent investor would think of building a similar project on a similar site today, but the City has provided no analysis of how sale prices of analogously situated properties compare to depreciated replacement costs, nor any reasoned estimate of the appropriate economic obsolescence factor for Redbank. Even the replacement cost figure itself is suspect, because these buildings, exempt from building codes and built in the emergency conditions existing early in World War II without any particular thought of lasting beyond that emergency, were built to specifications below any to be found in the City's manuals.

Similarly, the market analysis on which the Assessor in his testimony before the Board relied for correlation is crippled by the dearth of comparable properties. The Board acted within its discretion in rejecting the taxpayers' market comparisons with low income rental properties in other communities, but that decision left the Board with little else to go on for a market approach. The record establishes the problem with constructing a market comparison on the assumption that the individual apartments or individual buildings were to be sold as free-standing units. Both the As-

sessor and a professional witness presented by the taxpayers attempted such a market analysis, but they came up with very different conclusions because of the difficulty of selecting appropriate assumptions for the hypothetical sales, such as the assumed expenditures necessary to make the apartment complex saleable in individual units. Their conflicting testimony demonstrates the hypothetical nature of an analysis based on the market for sale of apartment units. In contrast, the income approach is itself directly based on a real market—that is, the actual market rentals and operating expenses for these particular sizeable apartment complexes operated by the same owners for over 35 years.

Those methodological deficiencies of the cost and market approaches do not render futile, however, the task of estimating the fair market value of Redbank and Millcove with a reasonable degree of precision. These properties are as uniquely suitable for appraisal by the income approach as they are unsuitable for the cost or market approaches. They have a stable, long-term, high-volume rental history, a fact situation diametrically opposed to that in *Frank v. Assessors of Skowhegan*, 329 A.2d 167 (Me.1974), in which the town assessors' choice of the cost over the income approach could not be said to be unreasonable. The cost data for the shopping center involved in *Frank* came directly from the costs incurred in its recent construction, whereas the shopping center had no long-term, stable occupant base on which to ground an income analysis.

The City has pointed to some of the problems inherent in the income method of valuation: the ability of the landlord to "manipulate" receipt and expense levels and the instability that the income method might tend to impose on municipal revenues. Both objections are overstated, particularly as applied to the large apartment complexes here at issue. The landlord's ability to control the level of receipts is limited by most landlords' desire to maximize income. To be sure, not all rents are set by arm's length transactions. In owner-occupied properties, for example, the fact that tenants are also nearest neighbors adds a significant nonpecuniary element to the transaction. But no such concern applies here. Nothing more than anecdotal evidence on this record suggests that the taxpayers are charging their tenants any less than the full fair market rental. In any event, proof of rents below the going market rates does not justify discarding the income method; rather it merely justifies the substitution of the economic rent for the actual rent figures. As for expenses, on rental properties of this sort a tax assessor can appropriately check any given year's expenses against the average expenses for a longer period and against standardized figures from available manuals. On both scores, the taxpayers' expert used what he found to be "stabilized net operating income" as the basis for arriving at his opinion of fair market value.

Stability in municipal revenues is of course important, *Frank v. Assessors of Skowhegan*, 329 A.2d at 175, but mere stability cannot be achieved by ignoring the constitutional obligation to assess all property according to its just value. We long ago said in *Alfred J. Sweet, Inc. v. City of Auburn*, 134 Me. 28, 32, 180 A. 803, 804 (1935), that

> the true value of a fixed asset such as real estate is fairly constant and must be gauged by conditions not temporary and extraordinary, but by those which over a period of time will be regarded as measurably stable.

When assessors employ income analyses they can and should use income and expense figures and capitalization techniques that take into account expected net income for a significant period into the future. Furthermore, the record in this particular case contains no suggestion that the income from Redbank and Millcove is depressed by conditions that could be classified as "temporary and extraordinary" in the words of *Sweet*. Whatever might be the shortcomings of the income approach in application to other rental properties in South Portland, they appear insignificant or nonexistent with regard to the taxpayers' properties, which are unique in that City.

■ We do not share the Superior Court's concern that consideration of the income approach for Redbank and Millcove and not for other properties in the municipality could well raise "the charge that ad hoc valuations were being used in lieu of the favored, uniform application of a single valuation approach." In the first place, these large apartment complexes, which have no comparables in South Portland, are also unique in both the methodological difficulty and uncertain reliability of the re-placement cost approach and the superior suitability of the income approach for ap-praising them. Furthermore, the objective of all appraisal methods is precisely the same: the determination of just or market value. If the fair market value of Redbank and Millcove is reliably determined by the income approach and the market value of other residential properties in South Port-land is reliably determined by the cost ap-proach, the constitutional and statutory mandate for equality of assessment will be achieved. There is no legal requirement that a municipality use the identical ap-praisal method on all properties.

### C.

Although the City correctly observes that the income approach to valuation is imperfect, so is any other method. We cannot demand certainty or perfection. *Cf. New England Tel. & Tel. Co. v. Public Util. Comm'n,* 148 Me. 374, 388–89, 94 A.2d 801, 808 (1953) (in a finding of the fair value of public utility property, "[w]e do not expect the impossible, and mathemati-cal accuracy is not required"). The City has made several valid criticisms of the taxpayers' own income-based appraisal. We are not acting here, however, as final-offer arbitrators to decide which of the opposing figures is better, nor can we sub-stitute our own estimate of market value. At this stage only the Board of Assessment Review has the ability, or the authority, to "grant[ ] such reasonable abatement as the board thinks proper." 36 M.R.S.A. § 843(1); *see Perry v. Town of Lincoln-ville,* 149 Me. 173, 175, 99 A.2d 294, 295 (1953). The taxpayers' abatement requests must go back to the Board for determina-tion of the fair market value of Redbank and Millcove as of April 1 of 1985 and 1986. In making that determination the Board must consider all relevant evidence, includ-ing the results obtained by applying an income approach to valuing the taxpayers' properties. Both the City and the taxpay-ers should be accorded the opportunity to supplement the record in further hearings on remand.

What we said of the role of the Public Utilities Commission decades ago in *Cen-tral Maine Power Co. v. Public Utilities Commission,* 150 Me. 257, 262, 109 A.2d 512, 514 (1954), is equally true of the role of the Board of Assessment Review on the remand to it of these abatement applica-tions:

The requirement that the Commission give "due consideration" to evidence tending to establish any factor of fair value does not mean that the Commission is not the judge of the weight to be given to the proffered evidence. Nor does it mean that equal weight must be given to each factor proven. The Commission may not proceed with a closed mind and no disposition to be convinced by unim-peachable evidence. "Due considera-tion" requires at least reasonable and fair consideration, and once a factor is well proven, "not only must the Commis-sion give consideration to it, but such factor must find reflection in the finding of value."

(quoting *Ashland Water Co. v. Railroad Comm'n,* 7 F.2d 924, 927 (W.D.Wis.1925)).

The entry is:

Judgment vacated. Remanded to the Su-perior Court with instructions to vacate the denial of tax abatements to plaintiffs by the South Portland Board of Assessment Review and to remand the case to that Board for further proceedings consistent with the opinion herein.

All concurring.