1997 ME 97

## TOWN OF SANFORD

v.

## J & N SANFORD TRUST.

Supreme Judicial Court of Maine.

Argued March 3, 1997.
Decided May 6, 1997.

Sally J. Daggett (orally) and William H. Dale, Jensen, Baird, Gardner & Henry, Portland, for plaintiff.

David P. Silk (orally), Curtis Thaxter Stevens Broder & Micoleau, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN and DANA, JJ.

DANA, Justice.

[¶ 1] The Town of Sanford appeals from the judgment of the Superior Court (York County, *Saufley, J.*) affirming the decision of the State Board of Property Tax Review. The Town contends that the Board erred as a matter of law in using the "lease fee value" of a shopping center to determine the appropriate amount of a property tax abatement. We agree and vacate the judgment.

[¶ 2] The J & N Sanford Trust owns the King's Plaza shopping center on South Main Street in Sanford. The center, built in the 1960s, sits on an eleven-acre parcel of land and has approximately 10 rental units within its one-story building. Because of the shopping center's dated architectural style, low energy efficiency, and particular floor layout, it suffers from substantial functional obsolescence.

[¶ 3] In April 1992 the Town assessed the value of the shopping center at $2,772,800 for property tax purposes. The Assessor denied the Trust's request for an abatement and the Trust appealed to the Town's Board of Assessment Review. When the Town Board denied the Trust's appeal, the Trust appealed to the State Board of Property Tax Review. At a hearing in July 1995 the Trust presented the testimony of Norman Gosline, a certified real estate appraiser, who provided two different figures for the value of the property: the "lease fee value" of $1.3 million [1] and the "fee simple value" of $1.7 million. According to Gosline, the lease fee value is determined by capitalizing the income produced by the actual leases on the property, while the fee simple value is determined by

---

1. Gosline first stated that the leased fee value of the property was $1.2 million, but after realizing an error in his capitalization rate adjustment he changed the figure to $1.3 million.

capitalizing the income that would be produced by market rents. The Trust's leases were below market rents so the lease fee value was lower than the fee simple value.

[¶ 4] John Gendron, a real estate broker who had worked with the owners of the King's Plaza in the past, testified that he advertised the Plaza for sale in 1991 for $1.4 million and that he received one offer of $900,000.

[¶ 5] Laurence Dolby, the assessor for the Town of Sanford, testified that he arrived at his 1992 assessment of $2,772,800 by using valuation data from 1987 and 1989 with an adjustment for annual depreciation. Dolby did not consider the recent income of the property when assessing the property's value in 1992 but used income information from the property's valuation in 1987. Dolby testified that he did not know if the $2,772,800 assessment represented the market value of the property.

[¶ 6] The Board concluded the Town's assessment was manifestly wrong. The Board then went on to determine the appropriate value of the property on which to base its abatement and discussed the difference between the $1.3 million lease fee value and the $1.7 million fee simple value. The Board's written decision states:

> [The Trust] presented evidence of value from both the income and market approaches which differs drastically from the assessment. On the other hand, the Town failed to consider the income approach to value. The Town presented no evidence of fair market value and, in fact, declined to assert that its assessment represented fair market value.
>
> The Board notes that the comparables used by [the Trust], whether distress sales or not, are an indication of the market. The Board notes further that [the Trust's] lease fee fair market value is reasonable.
>
> Therefore, ... the Board ... hereby grants an abatement to an assessed value of $1,300,000, which represents the leased fee value proposed by [the Trust], after correction for the capitalization rate.

[¶ 7] The Town sought review of the Board's decision in the Superior Court pursuant to 5 M.R.S.A. §§ 11001–11008 (1989) and M.R.Civ.P. 80C, asserting that the Board erred in using the lease fee value to determine the just value of the King's Plaza property. The court affirmed the Board's decision, concluding that although the valuation could not properly be based on the lease fee value alone, the Board did not err because it used the lease fee value along with other factors to determine the property's fair market value.

### I.

[¶ 8] The Town contends the Board's written decision and oral deliberations establish that it relied solely on Gosline's lease fee value to determine the fair market value of the property. We agree.

■ [¶ 9] When "the Superior Court acts in its appellate capacity, we review directly the decision of the Board for abuse of its discretion, error of law or findings unsupported by substantial evidence in the record." *IBM Credit Corp. v. City of Bath,* 665 A.2d 663, 664 (Me.1995) (citations omitted); 5 M.R.S.A. §§ 11007–11008 (1989) (setting forth manner and scope of judicial review).

[¶ 10] The Board's oral deliberations and its written decision establish that the Board used Gosline's lease fee value as the sole measure of the fair market value of the property. First, the Board's written decision states that the abatement based on the value of $1.3 million "represents the lease fee value proposed by [the Trust]." Second, the record of the Board's oral deliberations reflects that the Board members understood the distinction between the lease fee value and the fee simple value and that they chose to use the lease fee value of $1.3 million because they believed it better represented what a willing buyer would pay a willing seller for the property. For example, one member, in response to a question about whether the Board should use the $1.3 million or $1.7 million value, stated:

> [I]f anybody's going to buy that property, they want to make sure that they can make the payments and make some, earn some money. They're going to look at the lower figure, they'd have to. I mean,

who's going to buy it for two million, or a million-seven, or two million-seven? I mean, if they're going to lose money, I mean, I think the income approach is very clear in this case. I think the income approach has to be used.

Later, the chairman opined:

If we had a piece of property that had these incredibly above-market, advantageous leases, would we be looking at those in determining fair market value? It would in effect increase its value because it was subject to these long-term very favorable leases or above market leases. I suppose we would.

[¶ 11] Contrary to the Trust's argument, it does not appear that the Board took into consideration any factors or figures other than the lease fee value provided by the appraiser when it determined the property's fair market value. Although the Board's decision mentions unfavorable leases, the opening of a nearby Walmart, and generally depressed market conditions, the Board cites to these factors when it sets forth the Trust's arguments, not as the basis for its decision. Furthermore, these factors were included in the appraiser's analysis of both the lease fee value and the fee simple value, and the Board's mention of them therefore does not indicate that it considered the lease fee value as one factor among many others to determine the value of the property. Rather, the Board used the lease fee value by itself as a measure of fair market value.

## II.

[¶ 12] The Town contends that the Board erred as a matter of law by using the lease fee value to determine the just value of King's Plaza because use of the lease fee value violates the requirement in Maine's Constitution that all real property taxes be apportioned and assessed equally.[2] We agree.

[¶ 13] Article 9, section 8 of the Maine Constitution requires that "[a]ll taxes upon real and personal estate ... shall be apportioned and assessed equally, according to the just value thereof." We have held that "just value" is synonymous with true or market value. *Frank v. Assessors of Skowhegan,* 329 A.2d 167, 173 (Me.1974) (citation omitted).[3] Market value "has been judicially equated with that price a willing buyer would pay a willing seller at a fair public sale." *Id.* In addition, the

assessment must further represent the owner's equal portion of the burden of taxation, and if the assessors have not appraised at full true value but only at a fixed percentage of true value, then such treatment must be uniform and equal on all real estate and tangible property, so much so that if both cannot be obtained, then equality must prevail.

*Kittery Electric Light Co. v. Assessors of Town of Kittery,* 219 A.2d 728, 734 (Me.1966) (citation omitted).

[¶ 14] We afford "the local assessors considerable leeway in choosing the method or combinations of methods to achieve just valuations." *Shawmut Inn v. Town of Kennebunkport,* 428 A.2d 384, 390 (Me.1981). When a party challenges the Board's valuation on which the Board grants an abatement, the party "must establish that the method or methods used [in] arriving at

---

2. Although the Trust asserts that the Town waived this argument because it never made such an assertion during the Board's proceedings, the record establishes that the Town argued to the Board that use of the lease fee value was improper.

3. 36 M.R.S.A. § 701–A (1990 & Supp.1996) provides guidance to assessors for determining just value:

In the assessment of property, assessors in determining just value are to define this term in a manner which recognizes only that value arising from presently possible land use alternatives to which the particular parcel of land

being valued may be put. In determining just value, assessors must consider all relevant factors, including without limitation, the effect upon value of any enforceable restrictions to which the use of the land may be subjected, current use, physical depreciation, functional obsolescence, and economic obsolescence. Restrictions shall include but are not limited to zoning restrictions limiting the use of land, subdivision restrictions and any recorded contractual provisions limiting the use of lands. The just value of land is deemed to arise from and is attributable to legally permissible use or uses only.

the ultimate valuation do not pass constitutional and statutory muster." *Id.* at 393 (footnote omitted). "[A]n inherently discriminatory method of valuation cannot produce a just result, even though it is possible that in valuing the property by a proper method, the assessors may by chance arrive at the same result...." *Id.* at 393 n. 8 (citing *Farrelly v. Inhabitants of the Town of Deer Isle,* 407 A.2d 302 (1979)). When an appraisal method necessarily has a potential for unequal apportionment, it is an error of law for the assessors to use that approach. *Farrelly,* 407 A.2d at 306. *See also Moser v. Town of Phippsburg,* 553 A.2d 1249, 1250 (Me.1989) (when taxpayers show that assessor's system necessarily will result in unequal apportionment they do not have to show that property is substantially overvalued in order to obtain abatement).

[¶ 15] We have never squarely addressed whether the lease fee value or the fee simple value is the appropriate measure of fair market value for taxation purposes. We have, however, noted the distinction between actual lease value and market or fee simple value. *South Portland Assocs. v. City of South Portland,* 550 A.2d 363, 368 (Me.1988). At issue in *South Portland Assocs.* was the property valuation methodology to be applied to two large residential complexes. In response to the City's argument that the application of the income approach allowed the property owner to manipulate the value of the property by renting the property at below-market rates, we noted that "proof of rents below the going market rates does not justify discarding the income method; rather it merely justifies the substitution of the economic rent for the actual rent figures." *Id.* at 368. Similarly, we affirmed an assessor's refusal to use actual income figures when determining fair market value in *Frank v. Assessors of Skowhegan,* 329 A.2d 167 (Me.1974). In *Frank* the actual income for the first few years of a shopping center's operation was less than the owner originally anticipated and did not accurately indicate the value of the property. We reasoned that "[t]o require owners of property which is not income-producing to pick up the deficiency resulting from reducing the tax burden of income property owners each time there is a temporary downward trend in the economy, would surely not be either feasible or equitable." *Id.* at 175.

■ [¶ 16] The majority of jurisdictions that have addressed whether the fair market value may be based on a property's lease fee value have determined that the lease fee value by itself is not an appropriate measure. *E.g., Clayton v. County of Los Angeles,* 26 Cal.App.3d 390, 102 Cal.Rptr. 687, 691 (1972); *Valencia Center, Inc. v. Bystrom,* 543 So.2d 214, 217 (Fla.1989); *Martin v. Liberty County Board of Tax Assessors,* 152 Ga.App. 340, 262 S.E.2d 609, 611–12 (1979); *Springfield Marine Bank v. Property Tax Appeal Board,* 44 Ill.2d 428, 256 N.E.2d 334, 336 (1970); *Oberstein v. Adair County Board of Review,* 318 N.W.2d 817, 821 (Iowa.Ct.App.1982); *Donovan v. City of Haverhill,* 247 Mass. 69, 141 N.E. 564, 565 (1923); *Crossroads Center (Rochester), Inc. v. Comm'r of Taxation,* 286 Minn. 440, 176 N.W.2d 530, 535–36 (1970); *Demoulas v. Town of Salem,* 116 N.H. 775, 367 A.2d 588, 593 (1976); *City of New Brunswick v. State Division of Tax Appeals,* 39 N.J. 537, 189 A.2d 702, 706 (1963); *In re Property of Pine Raleigh Corp.,* 258 N.C. 398, 128 S.E.2d 855, 859–60 (1963); *People ex rel. Gale v. Tax Comm'n of New York City,* 17 A.D.2d 225, 233 N.Y.S.2d 501, 507 (1962); *Wynwood Apartments, Inc. v. Board of Revision of Cuyahoga County,* 59 Ohio St.2d 34, 391 N.E.2d 346, 347 (1979); *Swan Lake Moulding Co. v. Department of Revenue,* 257 Or. 622, 480 P.2d 713, 714 (1971); *Kargman v. Jacobs,* 113 R.I. 696, 325 A.2d 543, 548 (1974); *Yadco, Inc. v. Yankton County,* 89 S.D. 651, 237 N.W.2d 665, 668–69 (1975); *Rowland v. City of Tyler,* 5 S.W.2d 756, 760 (Tex.Com.App.1928); *Richmond, F. & P. R. Co. v. Commonwealth of Va.,* 203 Va. 294, 124 S.E.2d 206, 211 (1962). These jurisdictions conclude that "valuations of properties for local taxation cannot vary with the managerial successes or failure of the owners[,]" and that "the fair rental value, rather than the actual rent payable under an existing lease, must control." *City of New Brunswick v. State Div. of Tax Appeals,* 39 N.J. 537, 189 A.2d 702, 706 (1963). One court reasoned:

If tax assessments on the same property were to fluctuate according to the varying

terms of a lease, the computation of ad valorem taxes on the basis of such assessments would result in a tax penalty for one who, through business acumen or fortuity, succeeds in leasing his property for an amount in excess of its "fair market value" and a tax windfall to one who, through bad business judgment, leases far below his property's "fair market value."

*Martin,* 262 S.E.2d at 612. These jurisdictions "express the concern that the net effect of reliance on actual income in determining tax assessments is the destruction of the principle of uniformity in taxation. All [of these] courts indicate that assessment based on full potential earning capacity is the most fundamentally fair and even-handed method of distributing the tax burden." *C.A.F. Investment Co. v. Township of Saginaw,* 410 Mich. 428, 302 N.W.2d 164, 186 (1981).[4] Furthermore, property taxes are based on the sum of all rights that make up the property, not just on the lessor's individual interest. *E.g. Caldwell v. Department of Revenue,* 122 Ariz. 519, 596 P.2d 45, 47 (App.1979); *Dennis v. County of Santa Clara,* 215 Cal.App.3d 1019, 263 Cal.Rptr. 887, 893 (1989); *Heritage Cablevision v. Board of Review of City of Mason City,* 457 N.W.2d 594, 599 (Iowa 1990); *Donovan,* 141 N.E. at 565; *Gale,* 233 N.Y.S.2d at 504. Thus, "[t]he combined value of both the lessor's and lessee's interest under a long-term lease is subject to taxation." *Caldwell,* 596 P.2d at 47 (citation omitted). Here the lessor's interest is $1.3 million and the lessees' interest is $400,000 ($1.7 million minus $1.3 million). Omitting from taxation the difference between the lease fee value and the fee simple value presents a distorted picture of the true and full value of the property. *See, e.g., Yadco,* 237 N.W.2d at 668.

[¶ 17] Although the property's lease fee value may aid an assessor in determining a property's fair market value, the assessment should not be based on the lease fee value when the lease fee value is different from the fee simple value. Use of the lease fee value imposes an unequal tax on taxpayers who own the same or similarly situated property but manage it differently. It inherently discriminates against owners who use the property to its best potential and treats the same property differently depending on the owner's business practices. "To allow business acumen to form the controlling basis of property tax assessment ... would obliterate the principal concept of consistency." *C.A.F. Investment Co.,* 302 N.W.2d at 189. Equitable treatment of similarly situated taxpayers must take primacy over rigid adherence to the willing buyer-willing seller analysis. *See Kittery Electric Light Co.,* 219 A.2d at 734 (uniformity and equality is to be preferred as the just and ultimate purpose of the law when there is a conflict between fair market value and equality). When, as here, the Board acknowledges that the fee simple value of the property differs from the lease fee value, the Board should rely on the fee simple value to determine the amount of its abatement.

The entry is:

Judgment vacated. Remanded to the Superior Court with instructions to remand to the State Board of Property Tax Review for a redetermination consistent with the opinion herein.

---

**4.** Most of these courts recognize that the assessor may look to the actual income of the property as an indication of what the market value may be. *See, e.g., Springfield Marine Bank,* 596 P.2d at 336; *Oberstein,* 318 N.W.2d at 819–20; *Caldwell,* 596 P.2d at 47; *Martin,* 262 S.E.2d at 611.