2007 ME 36

**UAH–HYDRO KENNEBEC, L.P.**

v.

**TOWN OF WINSLOW.**

Supreme Judicial Court of Maine.

Argued: Feb. 14, 2006.
Reargued: Sept. 19, 2006.
Decided: March 1, 2007.

Michael L. Sheehan, Esq.(orally), Jonathan G. Mermin, Esq., Preti Flaherty Beliveau & Pachios, LLP, Portland, for plaintiff.

Peter M. Beckerman, Esq. (orally), 105 Stone Farm Brook Road, Sidney, William H. Dale, Esq. (orally), Jensen Baird Gardner Henry, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

LEVY, J.

[¶ 1] UAH–Hydro Kennebec, L.P. (UAH) appeals from a judgment of the Superior Court (Kennebec County, *Studstrup, J.*) affirming a decision of the State Board of Property Tax Review that upheld the Town of Winslow's assessment of UAH's 15.1 megawatt hydroelectric power generating plant located on the Kennebec River. UAH contends that the Town's assessor improperly considered a purchase power agreement (PPA) between UAH and Central Maine Power (CMP) as part of its assessment of the value of the plant for tax purposes. We disagree and affirm the judgment.

## I. BACKGROUND

[¶ 2] In 1984, Scott Paper negotiated a twenty-year agreement with CMP pursuant to which it would sell to CMP the output of a 15.1 megawatt hydroelectric plant to be constructed on a fourteen-acre parcel on the Kennebec River, of which eighty-eight percent is situated in Winslow and twelve percent is situated in Waterville. The origin of the agreement can be traced to the Public Utilities Regulatory Policies Act of 1978 (PURPA). *See* 16 U.S.C.S. § 824a–3 (Law. Co-op.1994 & Supp.2006). PURPA was enacted by Congress during the energy crisis of the 1970s to encourage non-oil energy production by creating a market for small power producing facilities to sell wholesale power and exempting such facilities from government regulations. *See id.* PURPA required electric utilities to enter into agreements with "qualifying small power production facilities"[1] to purchase their output, and

---

1. A "qualifying small power production facility" is defined as a small power production facility that "produces electric energy solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources or any combination thereof," whose power production capacity is not greater than 80 megawatts, which satisfies FERC's rules "respecting fuel use, fuel efficiency, and reliability," and "which is owned by a person not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities)." 16 U.S.C.S. § 796(17)(A)(i), (ii), (C)(i), (ii) (Law. Co-op.1994 & Supp.2006). *See also*

mandated fair pricing. *See id.; see also Fed. Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 750, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). PURPA authorized the Federal Energy Regulatory Commission (FERC) to adopt rules that would exempt qualifying facilities from various regulatory requirements governing the production of power. 456 U.S. at 751, 102 S.Ct. 2126. As the Board found, "[t]he requirement that utilities purchase power from small power producers ... and the promise of limited government regulation provided substantial government incentive for small power producers to develop and offer non-oil generated energy and/or capacity ... in the era of regulation. The effects of those major incentives ... continue beyond de-regulation."

[¶ 3] In 1984, CMP, in fulfillment of the requirements of PURPA, entered into a twenty-year PPA with Scott Paper to purchase hydro power produced by a hydroelectric dam to be constructed on the Kennebec River. Scott Paper subsequently executed a twenty-year lease of the dam site with UAH and assigned the twenty-year PPA to UAH. UAH agreed to construct the hydroelectric dam and pay Scott Paper a percentage of the profit earned from the PPA as rent.[2] The dam and the related facility took two years to construct and went online in 1989 at a cost of approximately $45 million dollars.

[¶ 4] Due to market forces in the 1990s, including lower oil prices and the deregulation of the electric industry,[3] the price of electricity that CMP paid pursuant to its PPAs eventually became higher than the price of electricity on the deregulated open market. In response, CMP sought to restructure or buy out its PPAs with the qualifying facilities in Maine. Twelve of the nineteen qualifying facilities rated over ten megawatts agreed to restructure their contracts with CMP, but UAH did not.[4] Thus, UAH's hydro plant has at all relevant times operated as a qualifying facility with a PPA in place.

[¶ 5] The Town's assessor determined the value of UAH's property as of April 1, 2000, to be $25 million dollars. UAH unsuccessfully sought an abatement from the Town, and then appealed to the State Board of Property Tax Review. *See* 36 M.R.S. § 271 (2006). Before the Board, UAH asserted that because of the deregulation of the electric market and the fact that it had the opportunity to have CMP buy out its rights under the PPA, the PPA should no longer be considered intangible property necessary to put its property to its highest and best use. UAH's appraisal expert testified that, based on his application of the reproduction cost less depreciation, sales comparison, and income capitalization methods of valuation, the overall

18 C.F.R. §§ 292.203, 292.207 (2006) ("General requirements for qualification" and "Procedures for obtaining qualifying status").

2. Pursuant to their agreement, UAH owns the improvements made during the lease period. At the end of the lease period all improvements, including the dam, are to be surrendered to Scott Paper. Scott Paper's rights under the agreement, including the reversionary rights to the improvements at the site, are now held by Madison Paper Industries. Both the lease and the PPA expire in February 2009.

3. *See* 35–A M.R.S. §§ 3201–3217 (2006) ("Electric Industry Restructuring").

4. The legislation that deregulated Maine's electric industry specifically provides that "[a]ll existing contracts and agreements in effect as of March 1, 2000, between electric utilities and energy resource providers, including but not limited to qualifying facilities, continue in effect notwithstanding any other provision of this Act." P.L.1997, ch. 316, § 5 ("An Act to Restructure the State's Electric Industry").

value of Winslow's share of the facility was $11.5 million dollars.

[¶ 6] The Town presented evidence that the highest and best use of the facility is, in the words of one of its expert appraisal witnesses, operating as "a PURPA qualifying facility complete with all the ramifications ... the qualifying status entails, including recognition of the contract with CMP." The Town contended that UAH's physical facilities and its PPA are inextricably entwined for several reasons, among them: (1) UAH cannot separate the tangible assets and the PPA and still recognize the full value of both; (2) the plant's cost structure is based on economic assumptions unique to the PPA that do not apply to a merchant plant operating in a deregulated environment;[5] (3) the plant's status as a "qualifying facility" is the product of regulatory approvals by FERC and the Maine Public Utilities Commission, that, like governmental licenses and permits, should be considered when determining the highest and best use of a commercial facility; and (4) the operation of the facility as a deregulated merchant plant is clearly inconsistent with its current legal status as a PURPA qualifying facility. The Town's witnesses testified in support of the $25 million dollar valuation based on the reproduction cost less depreciation method of valuation, reduced to account for the income method of valuation.

[¶ 7] The Board issued a detailed written decision in which it concluded that the Town was correct, as a matter of law, to value the facility as a qualifying facility with a PPA in place, and that UAH had failed to prove the assessment was manifestly wrong. The Board reasoned that

UAH's PPA "is inextricably intertwined with the highest and best use of the property as a [qualifying] facility operating under a PURPA contract and consequently the contract must be considered in valuing the property for ad valorem taxation." UAH appealed the Board's decision pursuant to M.R. Civ. P. 80C, and the Superior Court (*Studstrup, J.*) affirmed the decision of the Board. The court observed, "using a stream of income approach to valuing the hydro plant, it is appropriate to consider the highest and best use of that plant, which for now is production of electricity for sale to CMP under the PPA." Thereafter, UAH filed this timely appeal.

## II. DISCUSSION

[¶ 8] We consider, in order, (A) the applicable burden of proof and standard of appellate review; (B) UAH's contention that the Town's assessment constitutes unjust discrimination; and (C) UAH's contention that the Town's assessment is illegal.

### A. Burden of Proof and Standard of Review

[¶ 9] A taxpayer must prove an assessment is manifestly wrong in order to obtain an abatement. *Ram's Head Partners, LLC v. Town of Cape Elizabeth*, 2003 ME 131, ¶ 9, 834 A.2d 916, 919. An assessment is manifestly wrong if: (1) the property was substantially overvalued and injustice resulted; or if the assessment involved (2) unjust discrimination; or (3) fraud, dishonesty or illegality. *Yusem v. Town of Raymond*, 2001 ME 61, ¶ 9, 769 A.2d 865, 870. Before us, UAH asserts that the valuation of its facility as a going

---

**5.** The Town's appraiser noted in his report that as a PURPA qualifying facility, UAH's pretax return on equity is significantly less than that associated with a merchant facility because there is substantially less investment risk associated with a long-term fixed contract, and, for the same reason, its equity to debt ratio for financing is substantially greater than that for merchant facilities.

concern with the PPA in place violates the principle of uniformity of taxation and results in unjust discrimination. In addition, UAH contends that because the Town has no authority under Maine law to tax intangible property, the Town's consideration of the effect of the PPA, a form of intangible property, when appraising the facility under the income method of valuation renders the assessment illegal.

[¶ 10] When a party appeals a decision of the Superior Court in an action seeking review of a decision by the State Board of Property Tax Review, we review the Board's decision directly for abuse of discretion, errors of law, and sufficient evidence. *See Cent. Me. Power Co. v. Town of Moscow,* 649 A.2d 320, 322, 326 (Me. 1994); *Town of Vienna v. Kokernak,* 612 A.2d 870, 872 (Me.1992). In addition, as neither party contends the assessor erred by using the income approach as part of its overall methodology for valuing the property, we do not address the impact of an intangible asset on other methods of valuation. *See, e.g., Erie Blvd. Hydropower, L.P. v. Town of Ephratah Bd. of Assessors,* 9 A.D.3d 540, 779 N.Y.S.2d 634, 636 (N.Y.App.Div.2004) (discussing appraisals employing income, comparable sales, and cost valuation methods).

## B.  Unjust Discrimination in Taxation

[¶ 11] The Maine Constitution requires that property be assessed equally. ME. CONST. art. IX, § 8.[6] When determining just value, assessors "must consider all relevant factors." 36 M.R.S. § 701–A (2006). "In the assessment of property, assessors in determining just value are to define this term in a manner that recognizes only that value arising from *presently possible* land use alternatives to which

the particular parcel of land being valued may be put." *Id.* (emphasis added). Section 701–A expressly recognizes that assessors must consider, among other things, the "current use" of the property, and that "[t]he just value of land is determined to arise from and is attributable to *legally permissible* use or uses only." *Id.* (emphasis added). The constitutional requirement that property be assessed equally is the basis for the principle of uniformity, which requires uniformity in the mode of assessment and rate of taxation to ensure that all property owners share the property tax burden equitably. *Kittery Elec. Light Co. v. Assessors of Kittery,* 219 A.2d 728, 734 (Me.1966).

[¶ 12] Both the Board and the Superior Court concluded that the Town was justified in appraising UAH's plant as a hydroelectric plant that is a qualifying facility that sells electricity pursuant to a PPA, and not as a hydroelectric plant that operates without a PPA and sells electricity in the deregulated open market. UAH contends that the value of the plant should be determined by the open market rate for electricity output, not the presence or absence of an above-market PPA. Thus, UAH argues that including the value-enhancing effects of the PPA in the assessment of its plant is discriminatory and results in physically identical properties having different values for tax assessment purposes. UAH also notes that other power producers opted to sell or renegotiate their PPAs with CMP, while it elected to continue to operate under the PPA notwithstanding CMP's interest in renegotiating or terminating the agreement. Accordingly, UAH contends that the Town's inclusion of the value of the PPA in the

6.  "All taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof." ME. CONST. art. IX, § 8.

assessment is, in effect, a tax on UAH's business judgment.

[¶ 13] We have recognized that "[m]ost property tax discrimination cases involve a defined methodology that results in unequal treatment." *Ram's Head Partners*, 2003 ME 131, ¶ 13, 834 A.2d at 920. Where uniformity conflicts with just or market value, treating like taxpayers equally must prevail. *Kittery Elec. Light Co.*, 219 A.2d at 734. The principle of uniformity precludes the use of an appraisal method that will vary "with the managerial successes or failure of the owners" of the property. *Town of Sanford v. J & N Sanford Trust*, 1997 ME 97, ¶ 16, 694 A.2d 456, 460 (quotation marks omitted).

[¶ 14] UAH's plant was constructed for the purpose of taking advantage of qualifying facility status under PURPA, and the plant continues to benefit from that status irrespective of the deregulation of the electric energy market. But for UAH's plant's status as a qualifying facility, it would not be legally possible for it to qualify for a long-term PPA, and be exempt from federal and state utility regulations that apply to other power producing plants. An identical hydroelectric plant that is not a qualifying facility and does not have a PPA in place would have a lower income value based upon current electricity rates.

[¶ 15] The fact that it may be legally permissible for UAH to rescind or assign its PPA and forego the benefits of qualifying facility status is just that, a possibility. That possibility does not detract from the reality that even after deregulation, it continues to be *presently possible* and *legally permissible* for UAH's facility to produce and sell electricity under a more favorable rate structure and less demanding regulatory requirements than those that apply to plants operating in the deregulated market. *See Freeport–McMoran Res. Partners v. County of Lake*, 12 Cal.App.4th 634, 16 Cal.Rptr.2d 428, 433–35 (1993) (stating that the higher price the facility received pursuant to a PPA "is not the result of appellant's successful operation of its plants but of the regulatory scheme").[7]

[¶ 16] Assessors may consider a broad range of value-influencing aspects of the property being assessed because section 701–A directs that when "determining just value, assessors must consider all relevant factors." 36 M.R.S. § 701–A. The record supports the Board's conclusion that UAH's facility's unique status as a qualifying facility with a PPA in place is a relevant factor properly considered as part of the income method of valuation because that status distinguishes the facility from nonqualifying power plants that produce energy for sale in the deregulated energy market. Because the Town's assessment

7. Relying on our decision in *Town of Sanford v. J & N Sanford Trust*, 1997 ME 97, 694 A.2d 456, UAH also asserts that it is improper to consider the facility's actual income when applying the income method of valuation. In *J & N Sanford Trust*, we held that the Board erred in basing its valuation of a shopping center exclusively on the center's existing "lease fee value" (derived from the capitalization of the income produced by the below market rents from the center's actual leases in place), and failing to consider the property's "fee simple value" (derived from the capitalization of the income the center could produce from market rents). 1997 ME 97, ¶ 17, 694 A.2d at 461. We concluded that the Board's approach "inherently discriminates against owners who use the property to its best potential and treats the same property differently depending on the owner's business practices." *Id.* Here, the fact that UAH's facility might be able to produce power for sale in the deregulated market is relevant to the income method of valuation, but it is not determinative because it also legally permissible for UAH's plant to produce power for sale as a qualifying facility under PURPA.

properly recognized that the value of UAH's facility benefits from its unique regulatory status, it did not violate the principle of uniformity and was, therefore, not discriminatory.

## C. Illegal Assessment

■ [¶ 17] UAH also contends that the Town exceeded the bounds of its taxing authority by taxing the PPA, an intangible asset, because the Legislature has specifically limited *ad valorem* taxation to "tangible goods and chattels." 36 M.R.S. § 601 (2006). In addition, UAH asserts that even if we accept the Town's position that it may consider the value of the PPA so long as the PPA is an intangible asset that is "inextricably intertwined" with the plant, a tangible asset, the PPA could be terminated or sold separately from the plant, and the two are therefore not inextricably intertwined.

■ [¶ 18] An illegality occurs when there is an "impropriety in the manner in which the property was assessed," such as when tax-exempt property is assessed taxes, but not when the assessor has made errors in value calculation. *Goldstein v. Town of Georgetown*, 1998 ME 261, ¶ 8, 721 A.2d 180, 182. "An illegal assessment is . . . one that exceeds the bounds of the taxing entity's authority." *Yusem*, 2001 ME 61, ¶ 14 n. 12, 769 A.2d at 872.

[¶ 19] We have previously recognized that intangible property that is inextricably intertwined with a tangible asset may be considered in determining the just value of the tangible property. In *Glenridge Development Co. v. City of Augusta*, 662 A.2d 928, 931 (Me.1995), we determined that a HUD mortgage subsidy to a low-income housing project is a "value-influencing factor" that was properly considered when determining the just value of the real estate. Applying this principle here, treating UAH's facility's status as a qualifying facility with a PPA in place as inextricably intertwined with the plant's highest and best use is justified because, as determined by the Board, that status defines the current use of the facility and it has a substantial influence on its value. The question is whether this remains true after the deregulation of the energy market.[8]

[¶ 20] The answer lies in our earlier observation that UAH's plant's qualifying facility status under PURPA continues to define the current use made of the property, even though it has become legally pos-

---

8. The Board and the parties cite to case law from California and Massachusetts regarding purchase power agreements in support of their respective positions, but the cases were decided before full-scale deregulation of the utility markets in these states. *See Watson Cogeneration Co. v. County of Los Angeles*, 98 Cal.App.4th 1066, 120 Cal.Rptr.2d 421, 424–25, 428 (2002) (holding assessor properly considered the increase in the value of tangible property caused by intangible property that was inextricably intertwined because the contract represented the facility's highest and best use and that the facility's existence was inextricably intertwined with the government regulations that encouraged its construction); *Freeport–McMoran Res. Partners v. County of Lake*, 12 Cal.App.4th 634, 16 Cal.Rptr.2d 428, 433–35 (1993) (including value of a purchase power agreement in an income valuation appraisal where contract was integral to the economic viability of the facility; facilities with such contracts had higher sale prices; the contract was guaranteed income from government regulation, not business savvy; many other facilities in the area had similar contracts; the best use of the facility was to sell power under the contract; and the contract was inextricably intertwined with the facility because the contract allowed the facility to sell its power); *Turners Falls Ltd. P'ship v. Bd. of Assessors of Montague*, 54 Mass.App. Ct. 732, 767 N.E.2d 629, 634–35 (2002) (noting that a PURPA-initiated contract was "integral to the economic value of the property" and that even though the contract was a separate asset, no reasonable purchaser would buy the facility without it).

sible for UAH to forego that status. Qualifying facility status was integral to the rationale for the plant's construction, and remains integral to the current use to which the plant is put. This conclusion is not altered by the fact that it has become legally possible for UAH to relinquish the plant's qualifying facility status. It is undisputed that the plant is not used to produce power for sale in the deregulated energy market, and that the plant is not subject to the regulation and market forces that govern nonqualifying facilities. Because the PPA is a product of the plant's unique regulatory status as a qualifying facility under PURPA, the Board did not err in concluding that the PPA is inextricably intertwined with UAH's current use of its property.

The entry is:

Judgment affirmed.