2003 ME 28

**NORTHEAST EMPIRE LIMITED PARTNERSHIP # 2**

v.

**TOWN OF ASHLAND.**

Supreme Judicial Court of Maine.

Argued: Oct. 8, 2002.
Decided: March 5, 2003.

Alfred C. Frawley (orally), Tracey G. Burton, Preti Flaherty Beliveau Pachios & Haley, LLC, Portland, for plaintiff.

Robert J. Crawford (orally), Bernstein, Shur, Sawyer & Nelson, P.A., Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] Northeast Empire Limited Partnership # 2 (NELP) appeals from a judgment entered in Superior Court (Kennebec County, *Studstrup, J.*) affirming the decision of the State Board of Property Tax Review (Board) upholding the Town of Ashland's denial of property tax abatements for the 1997 and 1998 tax years on NELP's wood-fired electric power plant. NELP challenges the Board's finding that NELP's valuation of the plant was not credible and its conclusion that NELP had, therefore, not met its burden in challenging the Town's valuation. We affirm.

## I. FACTS AND BACKGROUND

[¶ 2] NELP is a limited partnership that owns a wood-fired electricity generation facility in Ashland. With financing from General Electric Credit Corporation (GECC), NELP constructed the facility, which was completed in 1993, for approximately $60,000,000. GECC became the owner of the facility and leased it to NELP, who had a power purchase agreement to sell power to Central Maine Power Company (CMP). In 1994, changes in the marketplace and energy regulation led NELP and CMP to renegotiate their

agreement so that NELP refrained from generating electricity but still received partial payments from CMP. On April 1, 1997, the evaluation date for the 1997 property taxes, NELP was not producing electricity and was receiving approximately $8,000,000 annually from CMP under the renegotiated agreement.

[¶ 3] Later in 1997, further negotiations resulted in another company purchasing the interests that NELP and GECC held in the CMP agreement. NELP received approximately $82,000,000 from this purchase, and NELP paid $63,000,000 to GECC to discharge its debt. NELP then paid GECC $2,000,000 to acquire ownership of the facility. In late 1997, NELP negotiated a contract to sell electricity to Maine Public Service at substantially lower rates than it had received under the agreement with CMP.

[¶ 4] For tax year 1997, the Town of Ashland valued the NELP power plant at $39,218,400. For tax year 1998, the Town lowered the assessed value by thirty-six percent to $25,000,000, because the assessor considered that revenues under the new contract with Maine Public Service would be thirty percent less than under the CMP contract and because of uncertainties with electrical deregulation.

[¶ 5] NELP made timely requests for an abatement of both the 1997 and 1998 taxes. The Town assessors denied both applications, and NELP appealed to the Board. The hearing before the Board was de novo.[1] During several days of hearings, the Board heard testimony from the

Town's assessing agent, Randy Tarr; reviewed two appraisal reports submitted by the Town; and heard the testimony of the author of one of the reports. NELP presented the appraisal report and testimony of its primary appraiser, Peter Huck, as well as the report and testimony of another appraiser. Other witnesses included an expert on the market price of electricity.

[¶ 6] The Board noted deficiencies in both the 1997 and 1998 Town appraisals, citing to *South Portland Associates v. City of South Portland,* 550 A.2d 363, 366–67 (Me.1988), which requires a town's assessors to use three approaches to market value: cost,[2] income, and sales comparison. The Board expressly declined to decide whether the Town had actually considered the income and sales comparison methods because NELP had not demonstrated a credible value for the plant. The Board determined that because NELP failed to prove credible values for the two tax years, it thereby failed to prove that the Town's assessments were manifestly wrong. The Board denied NELP's requests for abatements. NELP appealed to the Superior Court pursuant to M.R. Civ. P. 80C, and the court affirmed the Board's decision.

## II. DISCUSSION

[¶ 7] In appealing the denial of an abatement a taxpayer has to overcome the presumption that the assessor's valuation is valid. *Yusem v. Town of Raymond,* 2001 ME 61, ¶ 8, 769 A.2d 865, 869–70. In

---

1. For nonresidential property valued at over $1,000,000, an appeal to the Board is de novo. 36 M.R.S.A. § 273 (Supp.2002).

2. We have described the cost method as follows:

 The replacement cost method uses as its benchmark the amount it would cost, if the land were still unimproved, to buy the land and build a functionally equivalent struc-

ture upon it. An assessor using that method must then make one, and possibly two, downward adjustments: He must estimate the "depreciation," the difference in value between the hypothetical new building and the actual old building; and if constructing the hypothetical replacement would not be economically viable, he must make a further reduction for economic obsolescence.
*So. Portland Assocs.,* 550 A.2d at 367.

overcoming the presumption, the taxpayer must prove that the assessed value is manifestly wrong by demonstrating that (1) the assessor's judgment was irrational or so unreasonable that the property was substantially overvalued, resulting in an injustice; (2) there was unjust discrimination; or (3) there was fraud, dishonesty, or illegality. *Id.* ¶ 9, 769 A.2d at 870. A taxpayer does not overcome the presumption just by demonstrating that the assessor's methodology was improper. *Id.* ¶ 14, 769 A.2d at 872. In order for the Board to determine if the assessor substantially overvalued the property, the taxpayer has to present credible evidence of its value. *Id.* ¶ 13, 769 A.2d at 871–72. In this case the Board determined that the taxpayer had not presented credible evidence of value.

 [¶ 8] Although the taxpayer need not persuade the Board of the ultimate accuracy of its proffered value, the value presented by the taxpayer must be sufficiently credible to convince the Board that the property is substantially overvalued. *See Chase v. Town of Machiasport,* 1998 ME 260, ¶ 12, 721 A.2d 636, 640. In other words, even if a Board does not accept the value proffered by a taxpayer, if that suggested value and the basis for the value are credible evidence of the overvaluation of the subject property, the Board's responsibility to undertake an independent determination of value is triggered. *See Quoddy Realty Corp. v. City of Eastport,* 1998 ME 14, ¶ 4, 704 A.2d 407, 408. A Board may not escape that responsibility by simply declaring the taxpayer's value "not credible." Here, the Board ultimately determined that NELP's asserted value was not credible after undertaking a thorough analysis of the evidence. The Board carried out its responsibility to consider carefully the taxpayer's evidence, and concluded, in essence, that because the taxpayer's value was not credible, the taxpayer had failed to demonstrate that the property was substantially overvalued.

 [¶ 9] We review the Board's decision directly "for abuse of discretion, error of law or findings unsupported by substantial evidence in the record." *Town of Southwest Harbor v. Harwood,* 2000 ME 213, ¶ 6, 763 A.2d 115, 117. We equate the substantial evidence review of findings of an administrative agency with the clearly erroneous standard used in reviewing the findings of a court. *Green v. Comm'r of the Dep't of Mental Health, Mental Retardation & Substance Abuse Servs.,* 2001 ME 86, ¶¶ 9, 12, 776 A.2d 612, 615–16; *Kelley v. Comm'r, Me. Dep't of Human Servs.,* 591 A.2d 1300, 1303 (Me.1991). Thus, we do not overturn the findings unless the record compels a contrary finding. *Yusem,* 2001 ME 61, ¶ 9, 769 A.2d at 870. In this case, if the record compels a finding that NELP presented a credible assessment of value, we would remand the case to the Board for it to make an independent assessment of value.

 [¶ 10] NELP argues that the record compels a finding that it presented a credible assessment of value. Its primary appraiser, Peter Huck, valued the property at $2,500,000 for 1997 and $3,000,000 for 1998. He used the cost, income, and sales comparison approaches to value for both 1997 and 1998. The Board rejected Huck's valuations made under the three approaches as not credible.

[¶ 11] The Board rejected NELP's cost approach because Huck reduced the cost of replacement of the plant minus physical depreciation by an additional $12,000,000, which Huck derived solely from his income approach. The Board was concerned that Huck had not adequately explained why he had made the reduction, and, in the absence of such an explanation, the Board considered he had used the $12,000,000 figure to reduce the value of the cost approach to match the value from that of the income approach value. Furthermore, the

Board did not believe that Huck's use of the cost of a large gas-fired combined cycle plant to develop the replacement cost for the smaller wood-fired NELP plant was credible.

[¶ 12] The Board had more concerns about Huck's income approach. The projected price per kilowatt-hour used by Huck was substantially less than the prices in the testimony of two of NELP's other witnesses. It found that Huck's adding of two percent to the cost of capital because of the "small company effect" on the cost of capital was not credible without substantiation, which was lacking. The Board also found that Huck's inclusion of an income tax expense was a flaw in his analysis and that it was not clear how property taxes were adjusted for or included. The Board was also concerned that Huck's use of a decommissioning cost of $3,500,000 was not substantiated.

[¶ 13] The Board found further flaws in Huck's sales comparison approach. Specifically, it did not believe that the inclusion of a site remediation expense was justified because it appeared, in both 1997 and 1998, that the plant was going to continue to operate rather than be removed or liquidated. The Board questioned the quality of the comparable sales, noting that two of the sales were not identified and that two other sales were not included. The Board was not convinced that the $2,000,000 that had been paid for the plant by NELP to GECC represented market value because it was only one part of complex negotiations; it constituted a small part of what was paid to GECC; there was no indication that the plant had been offered on the open market; and there was no indication that GECC would have been able to sell the plant subject to the $63,000,000 owed on it.

[¶ 14] NELP argues that the Board was in error in some of its criticisms of Huck's analysis. For example, it argues that Huck's price per kilowatt-hour was supported by the amount that NELP was actually receiving at that time and that the expensing of income tax is accepted valuation practice. NELP's primary disagreement with the Board, however, lies in its assertion that the Board erred because the Board believed it had to take an all or nothing approach, that the Board had to accept Huck's analysis in toto, or reject it entirely. Furthermore, NELP contends that the Board failed to analyze how the flaws that the Board identified in Huck's report actually impacted the bottom line of value.

[¶ 15] These arguments fail, however. The Board did not conclude that it had to take an all or nothing approach. It is obvious that the Board concluded that the numerous flaws in Huck's analysis, which the Board outlined in detail, defeated the entire appraisal. As the fact-finder, the Board was entitled to make that conclusion. A fact-finder who hears inconsistencies, unexplained assertions, and incorrect assumptions in the testimony of a witness is entitled to reject that witness's testimony entirely.

[¶ 16] Furthermore, NELP is incorrect in its assertion that the Board was compelled to accept aspects of Huck's appraisal that it found incredible. While NELP points out that Huck's per kilowatt hour rate has justification, the Board did not have to accept it because the Board had evidence of other rates which came from NELP's own witnesses. NELP likewise criticizes the Board's rejection of Huck's after-tax method, but it failed to demonstrate to the Board why the after-tax method was appropriate. NELP's argument that the Board rejected the undisputed evidence that NELP paid GECC $2,000,000 for the plant in 1997 also misses the mark. The Board did not reject this evidence; it simply was not persuaded that

the sale was an arm's length transaction that demonstrated fair market value in spite of a witness's assertion that GECC was an astute company that would not have sold the plant at less than fair market value. The Board noted that the sale was only one part of other transactions between NELP and GECC. It was not inappropriate for the Board to consider the other transactions between NELP and GECC and the context within which the $2,000,000 sale was made.

[¶ 17] NELP argues that we should require the Board to arrive at its own determination of value when it rejects, as not credible, the taxpayer's valuation. NELP argues that after a taxpayer has gone to the time and expense of hiring an expert for an appraisal, a tax review board should not be allowed to simply reject that appraisal as not credible. If the Board in this case had rejected NELP's appraisal with the two words, "not credible," we would agree. But that is not the case. The Board articulated in detail its numerous reasons for finding the appraisal not credible. We cannot conclude that the Board was compelled either to accept NELP's appraisals on their face or to determine its own value for the plant.

The entry is:

Judgment affirmed.