STATE OF MAINE                                            SUPERIOR COURT
PENOBSCOT, ss.                                           CIVIL DIVISION
                                                        DKT. NO. CV-16-99

ENGINEERING DYNAMICS, INC.,               )
        Plaintiff,                        )
                                          )
v.                                        )          **JUDGMENT**
                                          )
RUDMAN & WINCHELL, LLC and                )
JOHN K. HAMER,                            )
        Defendants.                       )

        This is an attorney negligence action.  Plaintiff Engineering Dynamics, Inc., holds the rights

to petition for and receive property tax abatements from the Town of Cushing for the April 1, 2005

tax year for two subdivisions (Meduncook Plantation and Gaunt Neck) that were being developed in

Cushing.[1]  After failing to persuade the Town to grant the tax abatements in full, Plaintiff appealed

the denial to the State Board of Property Tax Review (the Board).  The appeal concerned 6 lots in

Meduncook Plantation and 14 lots in Gaunt Neck.  The Board received a substantial amount of

testimony over 9 days spread out over 20 months.  In order to meet its burden before the Board,

Plaintiff offered the testimony of and appraisal by Norman Gosline, who was a real estate appraiser,

consultant, and broker.[2]  Mr. Gosline attempted to demonstrate (1) that Plaintiff's properties were

treated unequally in relation to other properties within Cushing, and (2) that the properties were

overvalued by the assessment.  He offered both an assessment ratio study and an appraisal that relied

---

[1] The entities that instituted the tax abatement proceedings in 2005 were Cushing Holdings, LLC (CH) and Last Resort Holdings, LLC (LRH).  James Tower was the sole owner of each entity.  (R. Ex. 1, 2:5-15 (Apr. 14, 2008).)  He also owned Engineering Dynamics.  (R. Ex. 1, 24:20-21 (Apr. 14, 2008).)  Before the State Board of Property Tax Review issued its decision on CH and LRH's appeal of the denial of the abatements, CH and LRH administratively dissolved.  (Pl.'s Compl. ¶ 11.)  CH and LRH—who had received the rights from Machias Savings Bank (R. Ex. 12, Petitioner's Ex. 33 before the Board.)—assigned the rights to petition for and receive property tax abatements regarding the 2005 tax abatement proceedings to Plaintiff.  (Pl.'s Compl. ¶ 12.)  The Court will simply reference "Plaintiff" in this order for the sake of simplicity.  Additionally, there was a third subdivision being developed by Mr. Tower called Hornbarn Hill, but there were no lots in that subdivision subject to the appeal.  The record did, however, contain information about Hornbarn Hill because it was located near and being developed at the same time as Meduncook Plantation and Gaunt Neck.

[2] Mr. Gosline passed away while the present attorney negligence case was pending for trial.

1

on the "subdivision development method." In the formal written decision that the Board issued on May 4, 2010, it rejected Mr. Gosline's testimony and appraisal as not credible evidence of just value. The Board therefore concluded that Plaintiff had not met its burden before the Board and denied Plaintiff's appeal.

Plaintiff then retained Defendants to pursue an 80C appeal to the Superior Court. Defendants' attempted appeal of the Board's decision was dismissed by the Superior Court for lack of jurisdiction due to the petition being filed one day beyond the statutory deadline. *See generally Mutty v. Dep't of Corr.*, 2017 ME 7, ¶ 8, 153 A.3d 775 (citations and quotation marks omitted) ("The time limits set forth in the Administrative Procedure Act (APA) are jurisdictional, meaning that unless the petition is timely filed, the court lacks jurisdiction."). Plaintiff then filed the pending action in June 2016.

The parties appeared for a bench trial on July 26, 2019, where the issue of the causation prong of the negligence claim was argued. Plaintiff was represented by Jed Davis, Esq., and Defendants were represented by John Whitman, Esq. The Court has reviewed the Board's record and considered the arguments presented by each side in their respective trial briefs. It now issues this decision.

## LEGAL STANDARD

"To prove attorney malpractice, a plaintiff must show (1) a breach by the defendant of the duty owed to the plaintiff to conform to a certain standard of conduct; and (2) that the breach of that duty proximately caused an injury or loss to the plaintiff." *Pawlendzio v. Haddow*, 2016 ME 144, ¶ 10, 148 A.3d 713. A showing of proximate cause is necessary to succeed on a legal malpractice claim, and that requires introducing "evidence and inferences that may reasonably be drawn from the evidence indicat[ing] that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence." *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778.

Generally, "a plaintiff must demonstrate that he or she would have achieved a more favorable

2

result but for the defendant's alleged legal malpractice." *Niehoff v. Shankman & Assocs. Legal Ctr., P.A.,* 2000 ME 214, ¶ 9, 763 A.2d 121. "A 'mere possibility' of a more favorable result is insufficient . . . ." *Brooks v. Lemieux,* 2017 ME 55, ¶ 10, 157 A.3d 798. When the alleged legal malpractice stems from a failure to perfect an appeal, "whether an appeal not taken would have succeeded is within the exclusive province of the court, not the jury . . . ." *Steeves v. Bernstein, Shur, Sawyer & Nelson, P.C.,* 1998 ME 210, ¶ 15, 718 A.2d 186 (citations and quotation marks omitted).

The issue here then becomes whether Plaintiff would have received a better outcome had the Rule 80C appeal been filed on time. Making this determination requires a counterfactual analysis of the "case within the case." In other words, what was the likelihood that Plaintiff would have received a better outcome with respect to the requested abatements if the Rule 80C appeal had been filed on time? Would the Superior Court have vacated the Board's decision and remanded the case back to the Board to engage in an independent determination of fair market value? If the Superior Court did vacate and remand, after conducting this hypothetical independent determination of fair market value, would the Board have granted the requested abatements? This requires a dive into the law on tax abatement requests and appeals of denials of such requests.

When a taxpayer appeals the denial of an abatement to the Board it has to overcome the presumption that the assessor's valuation is valid. *Yusem v. Town of Raymond,* 2001 ME 61, ¶ 8, 769 A.2d 865. In order to overcome this presumption of validity, the taxpayer must meet an initial burden by proving to the Board that the assessment is manifestly wrong by showing that "(1) the judgment of the assessor was irrational or so unreasonable in light of the circumstances that the property was substantially overvalued and an injustice resulted; (2) there was unjust discrimination; or (3) the assessment was fraudulent, dishonest, or illegal." *Id.* ¶ 9. Merely impeaching the assessor's methodology is not sufficient to show that the assessment is manifestly wrong. *Id.* ¶ 13. Instead, when the taxpayer attempts to meet its initial burden to show that the assessor substantially overvalued

3

the property, the taxpayer must present the Board with credible evidence of its view of just value to demonstrate the assessment is manifestly wrong. *Id.* ¶ 8.

"If, *but only if,* the taxpayer meets that burden, the [Board] must engage in an independent determination of fair market value . . . based on a consideration of all relevant evidence of just value." *Id.* (emphasis added) (quotation marks omitted). Even if the taxpayer does not convince the Board of the ultimate accuracy of its position on just value, "if that suggested value and the basis for the value are credible evidence of the overvaluation of the subject property, the Board's responsibility to undertake an independent determination of value is triggered." *Northeast Empire Ltd. P'ship # 2 v. Town of Ashland,* 2003 ME 28, ¶ 8, 818 A.2d 1021. However, if the taxpayer does not present credible evidence of just value to meet its initial burden, the Board is left unable to make any comparison of the taxpayer's view of just value in relation to the assessed value, and the Board is not compelled to grant an abatement. *Wesson v. Town of Bremen,* 667 A.2d 596, 599 (Me. 1995).

When a taxpayer appeals the Board's denial of an abatement to the Superior Court on a Rule 80C appeal, the Court reviews the Board's decision "for abuse of discretion, error of law, or findings unsupported by substantial evidence in the record." *Town of Southwest Harbor v. Harwood,* 2000 ME 213, ¶ 6, 763 A.2d 115. The Court "will vacate the [Board's] conclusion that the taxpayer failed to meet [its] burden [to show the assessment is manifestly wrong] *only if the record compels a contrary conclusion to the exclusion of any other inference." Yusem,* 2001 ME 61, ¶ 9, 769 A.2d 865 (emphasis added) (quotation marks omitted). If the record compels a contrary finding that the taxpayer provided the Board with a credible assessment of value and met its burden to prove the assessor's assessment was manifestly wrong, the Court would remand the case to the Board to make an independent assessment of value. *Northeast Empire,* 2003 ME 28, ¶ 9, 818 A.2d 1021.

## DISCUSSION

The result of the underlying proceeding before the Board appears to the Court to be closely

4

analogous to that in *Northeast Empire Ltd. P'ship # 2 v. Town of Ashland.* In *Northeast Empire*, the Town's assessor valued Northeast Empire Limited Partnership's ("NELP") property at $39,218,400 for the tax year of 1997. *Id.* ¶ 4. The assessor valued it 36% lower for the tax year of 1998, which was related to the fact that NELP would receive lower revenues due to a contract it had starting with Maine Public Service as compared to the prior contract it had with Central Maine Power. *Id.* ¶¶ 3-4. NELP requested abatements for both years, but the assessor denied both the applications for the 1997 and 1998 abatements, and NELP appealed to the State Board of Property Tax Review. *Id.*

In front of the Board, NELP offered an appraiser who presented an appraisal report and gave testimony. *Id.* The Board noted some deficiencies with the Town's appraisals, but it did not decide whether or not the Town had properly appraised the property because it determined that NELP did not meet its initial burden to present credible evidence to show that the Town's assessment was manifestly wrong. *Id.* ¶¶ 6-7. NELP filed a Rule 80C appeal with the Superior Court, but the Superior Court affirmed the Board's decision. *Id.* ¶ 6.

In upholding the denial of the abatements the Law Court explained that "a Board may not escape [the responsibility to undertake an independent determination of value] by simply declaring the taxpayer's value 'not credible.'" *Id.* ¶ 8. However, the Law Court found that the Board had not simply stated NELP's asserted value was not credible, but instead engaged in a thorough review of the evidence before it in determining NELP had not carried its burden to present credible evidence to show the property was substantially overvalued. *Id.* The Law Court noted the numerous flaws the Board found with NELP's assessment. *Id.* ¶¶ 11-13. After its review of the Board's decision, the Law Court explained that "[i]t is obvious that the Board concluded that the numerous flaws in [the appraiser's] analysis, which the Board outlined in detail, defeated the entire appraisal. As the fact-finder, the Board was entitled to make that conclusion. A fact-finder who hears inconsistencies, unexplained assertions, and incorrect assumptions in the testimony of a witness is entitled to reject

5

that witness's testimony entirely." *Id.* ¶ 15.

Further, the Law Court refused to accept NELP's argument that the Board should have been required to conduct an independent analysis of valuation even though it found NELP's proffered value not to be credible. It explained its rationale: "[i]f the Board in this case had rejected NELP's appraisal with the two words, 'not credible,' we would agree [that the Board should have conducted an independent analysis]. But that is not the case. The Board articulated in detail its numerous reasons for finding the appraisal not credible." *Id.* ¶ 17. Accordingly, the Law Court affirmed the Board's decision and did not require it to conduct an independent analysis of valuation in the absence of the taxpayer being able to meet its burden.

The above description of the *Northeast Empire* almost exactly mirrors what happened before the Board in this case. Here, Plaintiff attempted to get tax abatements on assessments for the tax year of 2005 on certain lots in two subdivisions that were in the process of being developed (though lots were being marketed and sold at the same time the subdivisions were being developed). The board of assessors almost entirely denied the requested abatements, and Plaintiff appealed to the Board. The Board engaged in thorough review and consideration of Mr. Gosline's testimony and appraisal. Nonetheless, it concluded that he did not offer credible evidence of just value. Because Mr. Gosline did not offer credible evidence of just value, Plaintiff did not demonstrate to the Board that the assessment was manifestly wrong. Because Plaintiff did not demonstrate to the Board that the assessment was manifestly wrong, the assessor's assessment—which the law requires to be presumed valid—stood. It is worth noting just a sampling of the issues with his testimony and appraisal that caused the Board to conclude he did not offer credible evidence of just value.[3] The examples provided

---

[3] Plaintiff contends that Defendant's reliance on the Board's concerns articulated in the record, but not expressly listed in the actual decision, are irrelevant because they expand upon the bases for which the Board rejected Mr. Gosline's testimony. Despite this, the Court disagrees. Other issues with Mr. Gosline's testimony and appraisal extant throughout the record are directly relevant to the proximate cause prong. Plaintiff must demonstrate that the record would have compelled a contrary result on the 80C appeal. When the record

here are not intended to be an exhaustive list of every issue with Mr. Gosline's testimony and appraisal. Instead, they are intended to show why the record on the untimely 80C appeal would not have compelled a contrary conclusion to the Board's finding that Mr. Gosline did not provide credible evidence of just value. *Cf. Yusem*, 2001 ME 61, ¶ 9, 769 A.2d 865 (emphasis added) (quotation marks omitted) (explaining that the Superior Court "will vacate the [Board's] conclusion that the taxpayer failed to meet [its] burden [to show the assessment is manifestly wrong] *only if the record compels a contrary conclusion to the exclusion of any other inference*").

First, Mr. Gosline tried to demonstrate that the assessment ratio applied to Plaintiff's properties resulted in unequal treatment in relation to other properties in Cushing. *See generally* 36 M.R.S. § 848-A. The Board was concerned with Mr. Gosline's testimony on this issue for a number of reasons. One such issue was that his assessment-ratio study had a number of "N/A" entries, which compromised the accuracy of what he purported the assessment ratio to be in the Town compared to what Plaintiff's lots were assessed at. (R. Ex. 14, "Decision," p. 7; R. Ex. 12, "Appraisal of Lots at 'Meduncook Bay Colony' Cushing, Maine," pp. 52-53 of Petitioner's (Revised) Ex. 23 before the Board.) While Mr. Gosline seemed to believe he used all that the Town had available, the Town's assessor explained that Mr. Gosline could have easily accessed the assessment values for what he had as "N/A" entries. (R. Ex. 7, 143:17-145:8 (June 2, 2008).) Furthermore, the assessor's testimony revealed a number of instances where Mr. Gosline's assessment-ratio study failed to properly account for multi-lot transactions. For instance, the first line of page 52 of his report shows Map 4, Lot 15-A selling for $475,000, but being assessed at only $55,000; the Town's assessor clarified that it was part of a larger sale (with Lot 15-B, which Mr. Gosline did not include on page 52). The Town's assessment was actually much higher. (R. Ex. 7, 140:23-147:25 (June 2, 2008); Ex. 13, Respondent's Ex. 54 before

instead points to the opposite conclusion, namely that the record *compels* the result that the Board reached, it is entirely relevant to focus on issues and errors not necessarily commented on by the Board in its decision to demonstrate why Plaintiff is unable to establish proximate causation.

the Board; *see also* R. Ex. 7, 155:3-159:5, 166:20-171:15, 180:6-182:19 (June 2, 2008).) The Board had every reason to be skeptical of Mr. Gosline's assessment-ratio study when it was based on faulty inputs. *Cf. Terfloth v. Town of Scarborough*, 2014 ME 57, ¶ 17, 90 A.3d 1131 (explaining that "evidence presented in an abatement hearing is within the Board's authority to believe or disbelieve"); *Northeast Empire*, 2003 ME 28, ¶ 15, 818 A.2d 1021 ("A fact-finder who hears inconsistencies, unexplained assertions, and incorrect assumptions in the testimony of a witness is entitled to reject that witness's testimony entirely."). The Board also found unreliable Mr. Gosline's use of the Multi-Listing Service to gather sale prices because, unlike the transfer tax forms that buyers and sellers sign under oath, values in the Multi-Listing Service are not reported under oath.[4] (R. Ex. 14, "Decision," p. 7.) The Board was well within its province to not accept Mr. Gosline's assessment-ratio study for this and myriad other reasons, and the record would not have compelled otherwise.

Second, Mr. Gosline attempted to demonstrate, mainly by way of the "subdivision development method," that the property was substantially overvalued. As he explained it, the "subdivision development method" was used to determine what the property was worth if Mr. Tower tried to sell the entire 390-acre property (i.e., Meduncook Plantation, Gaunt Neck, and Hornbarn Hill).[5] (R. Ex. 2, 5:1-6:18 (Apr. 15, 2008).) Mr. Gosline conceded that he "had the benefit of hindsight" for his appraisal, (R. Ex. 2, 6:11-18 (Apr. 15, 2008).), which the Board roundly criticized

---

[4] The unreliability of the Multi-Listing Service reporting was evidenced by the one Gaunt Neck lot that was under contract before April 1, 2005. Mr. Tower testified—and the documentation supported—that the lot was under contract in September 2004; the deed was executed March 31, 2005; the transfer took place on April 4, 2005; and that the sale price was $725,000. (R. Ex. 5, 25:18-29:9 (Apr. 29, 2008); R. Ex. 12, Petitioner's Ex. 22 before the Board.) Nonetheless, the Multi-Listing Service report stated that the lot was under contract in November 2004; it was sold April 13, 2005; and the sale price was $720,000. (R. Ex. 13, Respondent's Ex. 20 before the Board.) The Board's disregard of Mr. Gosline's reliance on the Multi-Listing Service seems to have been wholly appropriate.

[5] Mr. Gosline agreed one "thousand percent" that the "subdivision development method" was highly controversial in the appraisal community. (R. Ex. 4, 9:21-10:6 (Apr. 29, 2008).)

when it stated that he "took unfair advantage of hindsight by taking into consideration information that was not reasonably available to the market as of April 1, 2005." (R. Ex. 14, "Decision," p. 9.) A review of the record demonstrates numerous problems with Mr. Gosline's report and testimony that support the Board's rejection. For instance, he could not explain certain assumptions, he was missing data, and he had a number of arithmetic errors. (*See, e.g.,* R. Ex. 2, 79:7-82:2, 172:12-180:18 (Apr. 15, 2008).) He also did not use the correct tax map in his report. (R. Ex. 2, 69:24-70:2 (Apr. 15, 2008); R. Ex. 12, "Appraisal of Lots at 'Meduncook Bay Colony' Cushing, Maine," pp. 14 of Petitioner's (Revised) Ex. 23 before the Board; R. Ex. 13, Respondent's Ex. 50 before the Board.) Even given the chance to amend his report before his second day of testimony, which he did, Mr. Gosline still had errors that made it difficult for him to explain his approach and made it hard for the Board to follow.[6] (*See, e.g.,* R. Ex 3, 2:5-4:18, 7:5-22, 22:19-23:4, 66:23-69:13, 83:3-86:6, 114:14-120:22, 121:21-122:18 (Apr. 28, 2008).)

Most glaring to the Court—and it certainly weighed heavily into the Board's decision (R. Ex. 14, "Decision," p. 9.)—is the fact that Mr. Gosline originally had a 7-year sellout (or absorption) period when he appraised the property late in 2006 for work related to the creation of a conservation easement. When he came back to appraise it again in 2008 for the purpose of the abatement requests he then changed it to a 10-year absorption period. (R. Ex. 4, 10:19-14:8 (Apr. 29, 2008).) Changing the absorption period fundamentally changed how his model placed a value on the lots as of April 1, 2005, and he was able to game the numbers in a sense because he had the benefit of knowing that the

---

[6] It is clear that the parties were speaking past each other when it came to the "entrepreneurial profit" percentage in Mr. Gosline's appraisal. The Court did some basic arithmetic and was able to uncover what Mr. Gosline was attempting to do, which the Town's attorney and the Board were unable to do. Mr. Gosline was nonetheless unable to explain it in any comprehensible manner to the Town's attorney and the Board in real time. (*See, e.g.,* R. Ex. 3, 97:19-100:20, 124:18-142:7 (Apr. 28, 2008).) Moreover, the Court simply could not understand what he intended to convey with the "entrepreneurial profit" because it seemed as though he was including it on the costs-to-complete side of the ledger. If so, it was a highly misleading name for a category in his appraisal.

real estate market crashed catastrophically in 2007 and 2008. The Town's assessor standing there in 2005 would have had to be a financial market savant to know that the market would crash. Instead, when the assessor was standing there in 2005, he was working with an appreciating market not just in Plaintiff's subdivisions, but in the Town in general. (R. Ex. 6, 50:8-24 (Apr. 29, 2008).) While there is plenty within the record that shows why the Board found Mr. Gosline's testimony and appraisal to be not credible, and does not show that it compels a contrary result, suffice it to say that the Board's decision would have been affirmed on a timely 80C appeal. The record does not compel that Mr. Gosline's testimony and appraisal were credible evidence of just value.

Notwithstanding the fact that the law requires assessments to be presumed valid and that it is a petitioner's burden to present credible evidence to overcome this presumption, Plaintiff contends that the Board erred by accepting the assessments because the lots were not individually saleable at the point at which they were being assessed in 2005. Plaintiff further contends that, notwithstanding the Board's finding that Plaintiff failed to meet its burden of presenting credible evidence of just value in order to overcome the presumption of validity, the Board should have rejected the Town's assessments and applied Mr. Gosline's proposed "subdivision development method." It bears pointing out that the contention that the lots were not individually saleable does not hold water.[7] James Tower conceded during his testimony that he entered into a purchase-and-sale agreement *before* the April 1, 2005 assessment. One lot in Gaunt Neck was under contract in September 2004, at which time Mr. Tower received "a substantial down payment." (R. Ex. 5, 25:18-29:9 (Apr. 29, 2008).) The

---

[7] It also bears pointing out that the Town's assessor indeed testified that he factored in the unfinished nature of the lots in his assessments, and that it was his intent to come in a bit lower with the assessments to factor in the unfinished nature of the lots. (R. Ex. 7, 72:2-15, 201:3-202:2 (June 2, 2008).) With the benefit of hindsight—which Mr. Gosline notably took advantage of when he changed his originally projected absorption rate of the lots from 7 years to 10 years (*See, e.g.*, R. Ex. 2, 170:10-17 (April 15, 2008).)—it is readily apparent that the Town's assessor was successful at his goal of coming in slightly below fair market value for his April 1, 2005 assessments on the subject lots. (R. 7, 199:17-203:13 (June 2, 2008); Ex. 13, Respondent's Ex. 48 before the Board.)

10

actual transfer did not take place until April 4, 2005, but the fact that lots in one of the subdivisions at issue on the appeal to the Board were being marketed and sold severely undermines the contention that they were not saleable at the time of the Town's assessment.

Furthermore, Mr. Gosline's own data listed sales occurring for Meduncook Plantation and Gaunt Neck lots contemporaneously to the development of the subdivisions. (R. Ex. 12, "Appraisal of Lots at 'Meduncook Bay Colony' Cushing, Maine," pp. 45-46 of Petitioner's (Revised) Ex. 23 before the Board.) While sales occurred after April 1, 2005, some occurred before the purported September 15, 2005 "commitment date" for the April 1, 2005 tax year.[8] (R. Ex. 14, "Decision," pp. 5-6.) While the lots (and subdivisions) may not have been finished around this time, they were being marketed and sold.

As detailed throughout, it is clear that Plaintiff would not have been able to establish on an 80C appeal that the record compelled a contrary result other than the Board's finding that Plaintiff's evidence of just value was not credible. Because Plaintiff would not have been able to establish that the record compelled a contrary result, Plaintiff has not met its burden in this attorney negligence case to demonstrate that it would have received a more favorable result had the 80C appeal been filed on time. Therefore, Defendant is entitled to judgment on Plaintiff's complaint.

---

[8] The Court did not receive a clear explanation of how this purported "commitment date" factors in relative to sales that occurred in 2005 after April 1 but before the "commitment date." The Town's assessor agreed with a description of it being "the date of the final tally of the valuations that were to be assigned to the properties [being] committed for the tax roles [sic]." (R. Ex. 7, 16:13-16 (June 2, 2008).). It appears the Town's assessor referenced the sales after April 1, 2005, to "double check" his work regarding assessments as of April 1, 2005. (R. Ex. 6, 49:22-50:7 (Apr. 29, 2008).) Regardless, it cannot be disputed that there was at least one lot contracted for sale for slightly under the listed price before the April 1, 2005 date, and other lots in the subdivisions were actively being listed for sale before April 1, 2005 (as early as 2004). (R. Ex. 3, 27:23-38:25 (Apr. 28, 2008); R. Ex. 4, 44:22-51:19 (Apr. 29, 2008); R. Ex. 5, 35:23-39:5 (Apr. 29, 2008); R. Ex. 13, Respondent's Ex. 20 before the Board.) This is despite the fact that all of the requisite approvals were not in place. (R. Ex. 7, 82:19-91:10 (June 2, 2008).)

The entry is:

1. Because Plaintiff cannot establish the proximate cause prong of its attorney negligence claim, judgment is granted in favor of Defendants.
2. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: _____

_____

Hon. William R. Anderson
Justice, Maine Superior Court

12