STATE OF MAINE
SOMERSET, ss.

8/13/20

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-19-05

MADISON PAPER INDUSTRIES,
    Petitioner

v.

**ORDER OF COURT**

TOWN OF MADISON,
    Respondent

## I.   Posture of the Case:

This case is before this Court on Petitioner Madison Paper Industries' (hereinafter "MPI") "Petition For Review" pursuant to Rule 80C, Maine Rules of Civil Procedure, 36 M.R.S. § 271, and 5 M.R.S. §§ 11001-11008. Specifically, the Petitioner is appealing the decision dated July 29, 2019 of the State Board of Property Tax Review (hereinafter "The Board") to deny MPI's appeal from the Madison Board of Assessors decision to deny certain abatement applications filed by MPI for the April 1, 2016 property tax year.

## II.   Factual Background:

1.  MPI was the owner of the Madison Paper Mill (hereinafter "Mill"), that included two hydro-electric plants, both situated in Madison and partially in Anson, Maine.

2.  For the tax year April 1, 2016, the total assessed value of the subject property, excluding BETE[1] exempt property, and including the two hydro-electric plants, was $72,362,681. The Town Of Madison (hereinafter "Town") assessed the Mill property, excluding BETE exempt property, at $38,070,181, and the two hydro-electric plants (the parts in Madison), again excluding BETE, at $34,292,500.

3.  These valuations are the subject of the current appeal. MPI asserts a value of $2,675,000 for the mill assets and $31,787,000 for the hydro-electric plants (also the parts located in Madison). This valuation is based on an appraisal by Duff & Phelps, authored by Robert Herman, in May of 2017 and included that as of April 1, 2016, "the premise of

---

[1] Business Equipment Tax Exemption, 36 M.R.S. §§ 691-699 (2010 & Supp. 2018).

value considered in this appraisal assumes that the paper mill assets subject to the appraisal will be liquidated and repurposed for a different use - not for paper making."

4. MPI was a partnership between the New York Times Company (hereinafter "NYT") and UPM-Kymmene Corporation (hereinafter "UPM"). MPI purchased the Mill in order to supply NYT, and presumably others as well, with super-calendered paper (hereinafter "SC") for advertising and other newspaper inserts.

5. The two hydro-electric plants provided 40% of the energy the Mill required, with MPI purchasing the remaining 60% on the market. Although the partnership's EBITA[2] had decreased notably in recent years, and the SC industry as a whole continued to decline because of the increasing move away from paper newspapers to online news, the mill nonetheless continued to maintain a positive cash flow, and it still operated in the black at the time of the appraisal. In addition, the mill, despite being over 30 years old, was well maintained, and was considered a "state of the art" facility.

6. UPM also produced SC paper at other locations in addition to Madison, and MPI did not deny that closing down the Mill – and preventing it from ever producing SC paper – would potentially benefit UPM.

7. On March 14, 2016, NYT/UPM announced the dissolution of their partnership, MPI, in the USA, the closure of the Mill, and the sale of the hydro power assets. The announcement did not state that the Mill would be sold. The offer to sell the Mill and the hydro power assets as a whole was not made. Unlike for the hydro property, for the Mill no broker was hired, no formal prospectus was issued, and no advertising was issued. On April 1, 2016, the Mill was operational, and neither NYT nor UPM were in financial difficulty.

8. Because the hydro property would be sold separately, most bids to purchase the Mill sought only the equipment, with no plans to operate the mill; indeed, everyone who submitted a formal bid for the mill assets was a liquidator.

9. Additionally, as UPM did with other closures worldwide, they placed restrictions on six pieces of MPI mill equipment critical to the production process. This restriction prohibited the equipment from being used on or off the premises or sold to anyone for use in the production of SC paper or to any mill that makes a paper product in competition with UPM. Moreover, the restriction specifically stated that the parties "agree that this restriction is reasonable in scope and duration [10 years] in order to protect the legitimate competitive interests of Seller and its Affiliates...."

10. Despite the rather significant restriction, Duff & Phelps seemingly did not take it into consideration in their appraisal, which the Board decision pointed out on numerous occasions – indeed, it seems that this was one of the primary reasons that the Board ruled against MPI. Ultimately, the mill property was sold in December 2016 to Somerset Acquisitions LLC, for $2,000,000 as scrap – Duff & Phelps cited the sale price as support

---

[2] Earnings before interest, taxes and amortization

for its conclusion of value of $2,675,000 exclusive of excess land. Pursuant to an asset agreement between the two companies, Somerset Acquisitions was forbidden from using certain equipment for the production of SC paper.

11. As mentioned above, the hydro-property was given more standard treatment, as UPM advertised its sale, issued a prospectus, and even hired Kleinschmidt as a sort of consultant for the sale of the hydro properties. The hydro property eventually sold to Eagle Creek after negotiations commenced in December 2016.

12. The sale formally closed in July 2017 a few days after Duff & Phelps issued its appraisal report. Duff & Phelps did not mention the sale price of the hydro property, as it did for the mill assets, claiming promise of confidentiality based on other work performed for Eagle Creek under a different assignment.

13. The Board convened on October 25, 26, and 29, 2018, to conduct a hearing on the substance of the appeal. The Board conducted deliberations on April 25, 2019, and concluded that MPI did not meet its burden to prove that the property was substantially overvalued, and denied the appeal.

### III. Standard of Review:

14. The Court reviews the Board's decision for abuse of discretion or findings not supported by substantial evidence in the record. *York v. Town of Ogunquit*, 2001 ME 53, ¶ 6, 769 A.2d 172. Substantial evidence is evidence that is sufficient for the Board to have reasonably found the facts as it did. *Ryan v. Town of Camden*, 582 A.2d 973, 975 (Me. 1990).

15. A Board's "decision is not wrong because the record is inconsistent or a different conclusion could be drawn from it." *Twigg v. Town of Kennebunk*, 662 A.2d 914, 916 (Me. 1996).

16. In appeals of denial of an abatement, the assessor's valuation is presumed to be valid. *Yusem v. Town of Raymond*, 2001 ME 61, ¶ 8, 769 A.2d 865, *overruled in part by Mainetoday Media, Inc. v. State*, 2013 ME 100, ¶ 10 n.8, 82 A.3d 104; *Petrin v. Town of Scarborough*, 2016 ME 136, ¶ 14, 147 A.3d 842. To rebut that presumption, a taxpayer has the affirmative burden to prove that the assessed value of the property "is 'manifestly wrong' by demonstrating that (1) the property was substantially overvalued and an injustice resulted from the overvaluation; (2) that there was unjust discrimination in the valuation of the property; or (3) that the assessment was fraudulent, dishonest, or illegal." *Ne. Empire Ltd. P'ship No. 2 v. Town of Ashland*, 2003 ME 28, ¶ 7, 818 A.2d 1021, 1024. *See also City of Waterville v. Waterville Homes, Inc.*, 655 A.2d 365, 367 (Me. 1995) (citations omitted) ("The taxpayer seeking abatement carries that burden by proving that the assessed valuation in relation to the just value is 'manifestly wrong'").

17. In order to meet this burden, impeaching the assessor is not, by itself, enough to prove the taxpayer's case. *Waterville*, 655 A.2d at 367. "The petitioner for an abatement

3

of taxes must prove his case. He must show that the property is overrated." *Sears, Roebuck & Co. v. City of Presque Isle*, 150 Me. 181, 186, 107 A.2d 475, 477 (Me. 1954), *superseded by statute*, 36 M.R.S. § 844, *as recognized in Town of Vienna v. Kokernak*, 612 A.2d 870, 873 (Me. 1992). "We will vacate the [Board's] decision that a taxpayer failed to meet his burden to show one of these three circumstances 'only if the record compels a contrary conclusion to the exclusion of any other inference." *Town of Bristol Taxpayers' Ass'n v. Bd. of Selectmen/Assessors for the Town of Bristol*, 2008 ME 159, ¶ 9, 957 A.2d 977; *Terfloth v. Town of Scarborough*, 2014 ME 57, ¶ 13, 90 A.3d 1121.

## IV. Discussion:

18.  The Maine Constitution provides that "[a]ll taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof." Me. Const. art. IX § 8; *Weekley v. Town of Scarborough*, 676 A.2d 932, 934 Me. 1996) ("Just value" means "market value.")

19.  Thus, an assessment must be supported by two factual findings. *Chase v. Town of Machiasport*, 1998 ME 260 ¶ 11, 721 A.2d 636, *overruled in part by Mainetoday Media*, 2013 ME 100, ¶ 10 n.8. "[F]irst, the property must be assessed at its fair market value." *Id.* (citing *Quoddy Realty Corp. v. City of Eastport*, 1998 ME 14, ¶ 9, 704 A.2d 407). "[S]econd, the assessed value must be equitable, that is, the property must be assessed at a relatively uniform rate with comparable property in the district." *Chase*, 1998 ME 260, ¶ 11.

20.  The undersigned acknowledges that "[t]he sale price of property is probative of its market value." *McCullough v. Town of Sanford*, 687 A.2d 629, 631 (Me. 1996) (quoting *Weekley*, 676 A.2d at 934); *see also Arnold v. Me. State Highway Comm'n*, 283 A.2d 655 (Me. 1971) ("An actual sale very near to the time at which the value is to be fixed is of 'great weight' as contrasted with mere opinion evidence."). Thus, the discrepancy between the town's assessed value of the mill properties, $38,070,181, and the ultimate sale price, $2,000,000, is, at least on its face, troubling.

21.  However, the Law Court has also found against taxpayers even when the sales price is significantly lower than the assessed value, *see, e.g.*, *McCullough*, 687 A.2d at 631, and the Law Court has never held "that the price from an arm's-length sale is *dispositive* of a property's fair market value," *Terfloth v. Town of Scarborough*, 2014 ME 57, ¶ 19 (emphasis added). Thus, in situations where outside factors significantly affect the fair market price, such as purchasing property at a distress sale, foreclosure sale, or an auction, or purchasing from a family member or some other non-arm's length transaction, *see Terfloth*, 2014 ME 57, ¶ 17; *see also Menard, Inc. v. City of Escanaba*, 315 Mich. App. 512, 528-29, 891 N.W.2d 1, 11 (2016), the sales price will not accurately reflect the true value, and appraisals for significantly more value may remain even after judicial review.

22.  As noted above, the Board believed that this was such a situation of an inaccurate reflection of the true value, as it was troubled by the major restrictions placed on the sale. Further, because the appraisal by Duff & Phelps did not take these restrictions

4

into consideration, the Board also found their appraisal not credible. Because of these sale restrictions, MPI failed to convince the Board that liquidation was the highest and best use of the mill property. Because it was MPI's burden to do so, they failed in front of the Board.

23. MPI's arguments in front of this Court fail for the same reasons. MPI asserts three specific arguments in this appeal, all of which fail to convince the undersigned that the Town's appraisal is "manifestly wrong" or that the "record compels a contrary conclusion to the exclusion of any other inference." First, MPI argues that the "Board erred by basing the value of the mill on its *current* use on April 1, 2016, rather than its highest and best use[.]" Second, it argues that the "Board erred by inconsistently taxing the hydros at their highest and best use while simultaneously taxing the mill at its current use on April 1, 2016, thereby double-counting the value of the hydros[.]" And third, MPI argues that the "Board erred by misapplying section 848-A in concluding that there was less than a 10% difference in the positions of the parties on the hydro values[.]" Among other problems, MPI erroneously asserts that the Board made these errors in valuation, when in fact, it was the Town that made the appraisal that MPI disputes, not the Board.

24. MPI's first argument can be easily dismissed. As the Respondent Town notes, this is a flawed argument in that it states that the Board made a legal error by using current use above highest and best use to value the property, when this is wrong for multiple reasons. As noted above, the Board did not perform any appraisal and come to any valuation on its own, and it did not make a legal determination to use one valuation method over the other, as MPI would suggest. Instead, the Board rejected Duff & Phelps' conclusion that the highest and best use of the mill property was liquidation. *See* Board Decision, 21, 23.

25. As the fact-finder, the Board was well within its discretion in rejecting Duff & Phelps' conclusions. *See Hutz v. Alden*, 2011 ME 27, ¶ 14, 12 A.3d 1174 ("The court is not required to accept an appraiser's valuation, however, and its decision to do so must be based upon a determination of the appraiser's credibility and the weight given that opinion."). Thus, as is true of most of its arguments, here, MPI simply tries to frame a factual question as a legal one in order to lower the standard of review on appeal. Because the Board never chose to use current use instead of highest and best use, and instead only determined that the mill's best use as of April 1, 2016 was not liquidation, as MPI's expert suggested, MPI's argument can be easily dismissed for failing to convince this Court that the Board's decision was manifestly wrong.

26. MPI's second argument is essentially that the hydro plants were double counted, because the Town valued the hydros at their highest and best use, but valued the mill at its current use on April 1, 2016. This too is easily dismissed, as there is no evidence that the Town took different valuation approaches as MPI suggests. What the Town did, which MPI acknowledges, was assign value to the power that the hydros produced for the mill, i.e. the saved costs of the mill by not having to purchase that 40% of its energy needs on the market. This "avoided costs" method may add a significant amount to the properties' total income, but the Court fails to see, as did the Board, how this "double counts" the value of the hyrdos. MPI does, however, point out that this avoided costs method awarded the

increased value to the hydros, when it argues that the increased value should have gone to the mill, as the mill would have purchased the power on the market, not the hyrdos.

27. While the power would undoubtedly ultimately power the mill, the Court doesn't see why awarding the avoided costs to the hyrdos is necessarily incorrect, as the power would still generate the hydros first before powering the mill. Regardless, as noted above, the chief problem for MPI is that it has the burden to persuade this Court that the Town's valuation was manifestly wrong and that the record compels a contrary outcome, a burden which MPI has not overcome.

28. MPI's final argument is that the Board used the wrong figure when calculating the difference between the Town's assessed value of the hyrdo properties and the Duff & Phelps' valuation, for purposes of 36 M.R.S. § 848-A. That section states that "[i]n any proceedings relating to a protested assessment, it is a sufficient defense of the assessment that it is accurate within reasonable limits of practicality, except when a proven deviation of 10% or more from the relevant assessment ratio of the municipality or primary assessing area exists." Both parties agree that Duff & Phelps valued the hyrdos at $31,787,000, but disagree on the correct number for the Town's valuation. The Town argues, and the Board agreed, that their appraisal valued the hyrdos at $34,292,500, while MPI argues that the Town actually appraised the hydros at $37,064,500. This is because the Town's valuation does not include BETE exempt property, while MPI's argued correct valuation does.[3]

29. Thus, MPI's argument is essentially that the Town's valuation should have included the BETE exempt property. Unsurprisingly, MPI doesn't really develop much of an argument to support this, as the entire section is two short paragraphs with no citations to case law or statutory sections. Again, given that MPI has a high burden on this appeal, their argument falls well short of carrying that burden, meaning this argument too must fail.

**V. Conclusion:**

30. MPI had a very tough burden to overcome in this case, as they had to prove that the Town's appraisal was "manifestly wrong," and MPI has failed in carrying that burden. In particular, the Court agrees with the Board that the failure of their appraiser, Duff & Phelps, to consider the burdensome sales restrictions placed on the sale of the mill property made their valuation highly suspect; accordingly, the Court is not surprised at all that the Board did not give much consideration to their appraisal (as it was the Board's right and responsibility, as the fact finder, to do).

31. Given that the mill property was a "state of the art" facility that was *designed* to produce SC paper, prohibiting any purchaser from using the mill as it was intended to be used indeed essentially meant that liquidating it was the only thing that a buyer *could* do with the mill. This, obviously, does not mean that the mills were worth what they sold for, and MPI cannot tell buyers not to use the mill as it was meant to be used and then argue

---

[3] Page 2 of the Board's decision includes a footnote that shows this. The hyrdos had BETE exempt property worth $2,771,968. 34,292,500 + 2,771,968 = 37,064,468.

6

that that restriction means it was worth significantly less to them, and resultingly pay a fraction of the taxes that they would otherwise owe.

32.    Accordingly, for the reasons stated above the Petition for Review is **denied** and the Board's decision is **affirmed.**

The Clerk is directed to incorporate this Order by reference into the docket for this case, pursuant to Rule 79(a), Maine Rules of Civil Procedure.

Date: 8/13/2020

BY _____

Robert E. Mullen, Chief Justice
Maine Superior Court

Date filed: 08/30/19        Somerset        Docket No.: AP-19-05
Action: 80C

| Petitioner: | Respondent: |
|---|---|
| MADISON PAPER INDUSTRIES | TOWN OF MADISON |
| ATTY: JONATHAN BLOCK, ESQ.<br>254 COMMERCIAL STREET<br>PORTLAND ME 04101 | ATTY: DAVID SILK, ESQ.<br>PO BOX 7320<br>PORTLAND ME 04112-7320 |

| DATE OF ENTRY: | ENTRIES: |
|---|---|
| 08/30/19 | Petition for Review Under Rule 80(C), Summary Sheet, copy of decision and filing fee all received and filed. |
| 09/09/19 | Respondent Town of Madison's Appearance and Statement of Position received and filed 09/06/19.<br><br>Notice and Briefing Scheduled forwarded to both parties this day. |
| 09/30/19 | Completed Certificate of Record, Summary of Contents, audio CDs of recordings (and flash drive) of hearings and deliberations, written decision, and transcripts marked as Exhibits B20, 21, 22 all received and filed 09/27/19. |
| 10/08/19 | Petitioner's Rule 80C Brief with Appendix; and Transcript of Board Hearings, Volume I, II, II all received this day. |
| 11/08/19 | Respondent Town of Madison's Rule 80C Brief received and filed 11/06/19. |
| 11/19/19 | Petitioner's Reply Brief received and filed. |
| 12/17/19 | Justice Mullen has filed to be given to Law Clerk, Phillip Banaszek. |
| 06/03/20 | Letter filed to court from David Silk and Jonathan Block, Esq. requesting an argument remotely. Forwarded to |